**D.F., M.F., and D.J.F., Plaintiffs,**

v.

**WESTERN SCHOOL CORPORATION and Kokomo Area Special Education Cooperative, Defendants.**

No. IP 94–0853–C.

United States District Court, S.D. Indiana, Indianapolis Division.

March 29, 1996.

562

Milo G. Gray, Jr., Indiana Protection and Advocacy Services, Indianapolis, Indiana, for plaintiffs.

Thomas D. Wheeler, Kightlinger & Gray, Indianapolis, Indiana, for defendants.

## MEMORANDUM OPINION

HAMILTON, District Judge.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1491, requires states, as a condition of receipt of certain federal funds, to ensure that all handicapped children have available to them a free appropriate public education. 20 U.S.C. § 1412(2)(B). The IDEA and its implement-

ing regulations establish a presumption in favor of what is often called "mainstreaming," that is, educating children with disabilities together with children who are not disabled. 20 U.S.C. § 1412(5); 34 C.F.R. §§ 300.8, 300.550. This case explores the outer boundaries of this mainstreaming requirement.

Plaintiffs are D.F. and his parents. D.F. is now thirteen years old; he was born thirteen weeks premature on February 24, 1983. He has mental disabilities classified as moderate or severe, hydrocephalus, communication disorder, a seizure disorder, cerebral palsy, and visual problems. Defendants are the Western School Corporation and the Kokomo Area Special Education Cooperative, which is a cooperative program among several school districts for providing special education services to handicapped children. Defendants had placed D.F. for several years in special education classes for moderately mentally handicapped children at Pettit Park Elementary School ("Pettit Park"), which is located outside the boundaries of D.F.'s home school district. During the 1992–93 school year, D.F.'s parents began to question whether D.F.'s placement in the moderately mentally handicapped program ("MoMH") at Pettit Park was appropriate. Prior to the 1993–94 school year, they sought to have D.F. reassigned to a program that would put him in a regular classroom with more extensive contact with non-disabled peers in his neighborhood school, Western Elementary School ("Western").[1]

After D.F.'s parents and the school officials disagreed about the proper placement for D.F. for the 1993–94 school year, his parents requested an evidentiary hearing pursuant to 20 U.S.C. § 1415(b). An independent hearing officer conducted an evidentiary hearing and ruled in favor of the school district. The state Board of Special Education Appeals upheld that decision. Plaintiffs now seek judicial review of that decision pursuant to 20 U.S.C. § 1415(e). In addition to their IDEA claim, plaintiffs also assert claims under Section 504 of the Rehabilita-

tion Act, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The court has subject matter jurisdiction under 20 U.S.C. § 1415(e), 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1337, 1343.

In this court, the parties have submitted the administrative record, including transcripts of testimony and documentary exhibits, from the proceedings before the hearing officer and the Board of Special Education Appeals. The plaintiffs have also submitted supplemental affidavits and reports from two expert witnesses, Gwen Chesterfield and Bradley Passenger. Defendants have submitted a supplemental affidavit with exhibits from Phyllis Craig, director of special services for the Kokomo Area Special Education Cooperative. Both sides have filed motions for summary judgment. As explained below, after review of the administrative record and the additional evidence submitted by the parties, the court agrees with the hearing officer that the defendants gave sufficient consideration to "mainstreaming" D.F. and had sufficient reasons not to pursue such a program for D.F. The court therefore upholds the decision of the hearing officer and board of appeals, and grants summary judgment for the defendants.

### Standard of Review and Summary Judgment

The standard for summary judgment under Fed.R.Civ.P. 56 is familiar. Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a finder of fact to find in favor of the non-moving party on the particular issue. *E.g., Methodist Medical Ctr. v. American Medical Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994). When considering a motion for summary judgment, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby,*

---

1. In the fall of 1994, D.F. began attending a special education program at Sycamore Middle School, which is also located outside the boundaries of his home school district. D.F. partici-

pates in the following integrated classes and activities: music, library, art, physical education, oral reading, lunch, hall passing, and convocations.

*Inc.* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ Where the court's task is to review an administrative record and decision to determine whether the decision is supported by substantial evidence and is otherwise according to law, summary judgment is ordinarily a useful vehicle. See, *e.g., Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). In that type of judicial review, credibility decisions are for the administrative decisionmaker rather than the court. The court considers only the facts presented by the administrative record, and there is rarely a dispute as to the contents of that record. If the administrative record contains substantial evidence that might have supported the contrary result in the administrative process, that fact carries little if any weight on judicial review. On the other hand, where the court makes its decision *de novo,* the contents of the administrative record may not matter at all. If there is conflicting evidence, the court conducting a *de novo* review must weigh that evidence and make its own decision, so that where the evidence conflicts on material facts, summary judgment will not be appropriate.

■ The standard of review under the IDEA lies somewhere between *de novo* review and the substantial evidence/otherwise according to law standard frequently applied to administrative decisions. *Elizabeth K. v. Warrick County Sch. Corp.,* 795 F.Supp. 881, 885 (S.D.Ind.1992). The IDEA provides that the reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decisions on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Under this statute, the court's role is not merely to determine whether the administrative findings are supported by substantial evidence and otherwise in accordance with law. *Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). In cases challenging administrative decisions under the IDEA, a district court must independently determine whether the IDEA's requirements have been satisfied.

*Board of Educ. of Murphysboro v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir.1994). The statutory directives to consider additional evidence and to decide on the preponderance of the evidence take the court's role well beyond the more familiar standards for judicial review of administrative adjudications. At the same time, the court does not hear the case *de novo,* erasing the blackboard and hearing all evidence as if for the first time. Congress has directed the courts to consider the administrative record. Pointing out that courts have no special expertise in educational policy, the Supreme Court has instructed that the lower courts must give "due weight" to the results of the administrative process, and should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. Accord, *Board of Educ. of Murphysboro,* 41 F.3d at 1166. The Seventh Circuit has squarely held that the party challenging the administrative decision has the burden of proof. *Id.* at 1167; *Board of Educ. of Sch. Dist. No. 21 v. Illinois State Bd. of Educ.,* 938 F.2d 712, 716 (7th Cir. 1991). Under this intermediate standard of judicial review, summary judgment can still be an appropriate vehicle for deciding IDEA claims. Nothing in the statute prohibits use of the summary judgment mechanism. See *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 928 n. 12 (10th Cir.1995); *Victoria L. v. District Sch. Bd.,* 741 F.2d 369, 372 (11th Cir.1984). In fact, "[s]ummary judgment is a common vehicle for addressing the merits of an IDEA case in the district court." *Board of Educ. of Downers Grove v. Steven L.,* No. 93 C 7168, 1995 WL 513572, at *3 (N.D.Ill. Aug. 25, 1995); see also *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994).

■ The hearing officer in this case heard substantial evidence that supported his decision in favor of the defendants. He also heard evidence that could have supported a contrary decision. Both sides have submitted additional evidence here, in the form of affidavits from special education experts. That evidence concerns more recent developments, coming after the due process hear-

ing.[2] Given the conflicting evidence in the record, summary judgment would not be appropriate if this court's task were to make a decision *de novo*. But under the applicable standard of review, the issue here is whether plaintiffs have come forward with sufficient evidence to allow a reasonable trier of fact to find that the hearing officer's decision was wrong on the merits, while giving "due deference" to the hearing officer's expertise and findings.

■ After careful review of the administrative record and the administrative decision, as well as the supplemental evidence offered by the parties, the court concludes that summary judgment for defendants is warranted in this case. Plaintiffs have not come forward with evidence that would support a reversal of the administrative decision, at least so long as the hearing officer's findings and judgments about educational policy are to be accorded any meaningful degree of deference. The real dispute here does not concern historical facts or judgments of credibility. The dispute here is a dispute between experts in special education over the extent to which mainstreaming is appropriate for D.F. The case thus presents a dispute over educational theory, practice, and policy—the type of dispute where deference to the educational expertise of a hearing officer is especially appropriate under *Rowley*, 458 U.S. at 206–08, 102 S.Ct. at 3050–52. Cf. *K.R. v. Anderson Community Sch. Corp.*, 887 F.Supp. 1217, 1221 (S.D.Ind.1995) (court did not defer to hearing officer's determination of question of law in interpreting applicable regulations). Under the IDEA, the plaintiffs are entitled to have the court take an independent and critical look at the evidence and the hearing officer's reasoning. The court has done so. However, the fact that experts disagree about the best program for D.F. does not necessarily require a trial to select an appropriate educational program for this child with disabilities.

### The Merits of D.F.'s IDEA Claim

The IDEA was enacted in part to "assure the effectiveness of efforts to educate children with disabilities." 20 U.S.C. § 1400(c). The Act emphasizes special education and related services, and provides funding for local school district programs. Regulations adopted pursuant to the IDEA set forth the details of the program. See 20 U.S.C. § 1417(b). Local school districts must comply with federal regulations in order to receive federal funding assistance, which is administered through state agencies. The parties agree that the IDEA and Indiana's regulations implementing the IDEA apply to defendants. See 511 I.A.C. § 7–12–2(a).

■ The IDEA requires defendants to provide D.F. with a free appropriate public education. However, a "free appropriate public education" is not necessarily the best possible education, or one that maximizes the potential of each child with disabilities, or one that is in some sense (difficult to define) "equal" to the education provided to children without disabilities. *Rowley*, 458 U.S. at 191–203, 102 S.Ct. at 3043–3049. Accord, *Board of Educ. Sch. Dist. No. 21*, 938 F.2d at 715. A free appropriate education is one that provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049. The concept of an "individualized education plan" (IEP) provides the primary vehicle for implementing the goals of the IDEA. *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). In fact, the regulations require state educational agencies to ensure the development and implementation

---

**2.** Such additions to the hearing record are permissible and appropriate. See *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472–73 (9th Cir. 1993), following *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 790–91 (1st Cir. 1984). As the First Circuit explained in *Town of Burlington*, the opportunity to supplement the record is not an opportunity to repeat or embellish prior testimony, but supplemental evidence may be needed to fill in gaps caused by mechani-

cal failure, a witness's unavailability, an improper exclusion of evidence, or the passage of time. "The determination of what is 'additional' evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*." *Town of Burlington*, 736 F.2d at 791. Accord, *Hunger*, 15 F.3d at 669.

of an IEP for each child with a disability. 34 C.F.R. § 300.341.

The IDEA imposes a presumption in favor of mainstreaming. It requires mainstreaming to the "maximum extent appropriate." See 20 U.S.C. § 1412(5)(B). A state receiving funds under the IDEA must ensure that "special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...." 20 U.S.C. § 1412(5)(B). The Fifth Circuit has described that mainstreaming presumption as a "strong preference," see *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir.1989), but that presumption is not without limits. "[T]he mainstreaming requirement was developed in response to school districts which were reluctant to integrate mentally impaired children and their non-disabled peers. It was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements...." *Murphysboro*, 41 F.3d at 1168. The federal regulations "contemplate that mainstreaming is not required in every case," *id.*, and mainstreaming to the "maximum extent appropriate" does not mean the maximum extent feasible. See *Murphysboro*, 41 F.3d at 1168 (school district's individual education plan that "mainstreamed" child with significant disabilities violated the IDEA because evidence showed the child was not benefiting educationally from mainstreaming). As the Fifth Circuit explained in *Daniel R.R.*, Congress created a tension between the twin statutory goals of seeking to mainstream handicapped children while, at the same time, seeking to tailor each child's educational placement and program to the child's special needs. 874 F.2d at 1044. "The Act does not, however, provide any substantive standards for striking the proper balance between its requirement for mainstreaming and its mandate for a free appropriate public education." *Id.* at 1045.

The Seventh Circuit has not specifically adopted a test to be applied when evaluating IDEA cases centered on 20 U.S.C. § 1412(5)(B). Other federal courts have articulated the standard in several ways. In *Daniel R.R.*, the Fifth Circuit explained that, in resolving the inherent tension in the IDEA, courts must recognize that mainstreaming may be appropriate even where a handicapped child is not able to learn at approximately the same level as non-disabled classmates. 874 F.2d at 1047. In addition, courts must take care not to place too much emphasis on strictly educational benefits of a child's program at the expense of non-educational benefits, such as language and behavior models of other children in a class. *Id.* at 1047–48. At the same time, courts must also take care not to intrude too much into educational policy choices that Congress deliberately left to school officials. *Id.* at 1046 (disagreeing with *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983)). The Fifth Circuit then articulated a two part test for determining compliance with the mainstreaming requirement:

> First, we ask whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R.*, 874 F.2d at 1048. Accord, *Oberti v. Board of Educ.*, 995 F.2d 1204, 1215 (3d Cir.1993) In *Board of Educ., Sacramento City Sch. Dist. v. Holland*, 786 F.Supp. 874, 878 (E.D.Cal.1992), the district court explained that the federal courts had recognized four factors in evaluating a placement where mainstreaming is an issue:

(1) the educational benefits available to the child in a regular classroom, supplemented with appropriate aids and services, as compared to the educational benefits of a special education classroom;

(2) the non-academic benefits to the handicapped child of interaction with nonhandicapped children;

(3) the effect of the presence of the handicapped child on the teacher and other children in the regular classroom; and

(4) the costs of supplementary aids and services necessary to mainstream the handicapped child in a regular classroom setting.

The Ninth Circuit affirmed and adopted this four factor test, 14 F.3d 1398, 1404 (9th Cir.1994); see also *Poolaw v. Bishop,* 67 F.3d 830, 836 (9th Cir.1995).

Whether the test is stated in two parts or four factors, the standards are very similar. The *Daniel R.R.* test states the standard in terms very close to the statutory terms. The *Holland* factors identify more specific levels of inquiry for applying the more general *Daniel R.R.* standard. In *Daniel R.R.,* the Fifth Circuit considered whether school officials had adequately considered mainstreaming with supplementary aids and services as an option (and indicated that expense could be considered in the inquiry); whether the child would receive an educational benefit from regular education; whether the child would benefit in other ways from a regular education; and what effect the handicapped child's presence would have on the classroom environment and the education of other children. 874 F.2d at 1048–49. These factors obviously track very closely the factors articulated in *Holland.* This court will apply the two part test stated in *Daniel R.R.* and *Oberti,* but will organize its discussion in terms of the four *Holland* factors. The first two of those focus on the interests of the child in question. They will be considered first, and they are dispositive in this case, without reaching the third and fourth *Holland* factors.

▪ **Educational Benefits:** Analysis of the educational benefits of placement in a regular education classroom as compared to a special education classroom requires close consideration of D.F.'s disabilities. If a child's disabilities are so severe that he would get little or no benefit from mainstreaming, then mainstreaming may not be appropriate, in spite of the statutory preference for mainstreaming. *Holland,* 786 F.Supp. at 878–79. Accord, *Board of Educ. of Murphysboro,* 41 F.3d at 1168.

▪ The hearing officer's Findings of Fact carefully review the extensive and detailed testimony on academic benefits of mainstreaming presented at the hearing conducted November 23, 1993. D.F. has cerebral palsy, hydrocephalus, seizure disorder, perceptual vision deficits and communication disorder. Psychological testing by Dr. Robin R. Hikada showed that at the age of ten, when his parents wanted him assigned to a regular fourth grade class, D.F. functioned intellectually at a level of less than two years old, commensurate with the "severely mentally handicapped range." (Resp.Ex. 1–D–2). His I.Q. was less than 32. Dr. Hikada estimated his daily living skills in the 2½ to 3 year old range and his socialization skills in the 2½ to 3½ year old range.

Plaintiffs point out that such age-equivalence measures can be misleading and can lead teacher and administrators (and, presumably, judges) to underestimate a child's abilities and potential. To be more specific, however, the evidence before the hearing officer showed that when D.F.'s peers in age were ready to begin the fourth grade, D.F. was unable to recognize the letters A, B, C, and D consistently. He could not copy or trace horizontal or vertical lines or circles. To write his name, D.F. required "hand-on-hand" guidance from a teacher. (*E.g.,* Resp. Ex. 1–D–2; A.R. at 910–12, 1005, 1051–52.) With respect to language skills, D.F.'s speech teacher explained that she was working with him on repeating "two-word chains, working toward three-word chains, having him repeat." He had been repeating two-word chains correctly about 60 percent of the time by December 1993, but had not yet mastered that and had not been able to move on to three-word chains. (A.R. at 941–43.) The speech teacher also worked with D.F. on processing and following two-step instructions or commands, such as clapping his hands then touching his head. At that time he was "working at about 50 percent" on those. (A.R. at 941–42.)

Carol Ann Davis was D.F.'s special education teacher in the MoMH class during the 1992–93 and 1993–94 school years. She testified that D.F. functioned at a lower level than the other students in his MoMH class. (A.R. at 980–82.) Davis characterized D.F. as borderline severely mentally handicapped.

She testified that D.F.'s IEP goals and objectives could not be satisfactorily met in regular education classes. Davis believed that D.F. would get no academic benefit from mainstreaming because he would not be able to keep up with the faster pace or comprehend any of the academic work in a regular education class.

Davis described at the hearing how she had recently taught her students a lesson on the Pilgrims. She said she does not lecture but walks among them and acts out the subject matter. She said: "[D.F.] is present but I think this is way over his comprehension at the time. Maybe he can repeat all this at home, I don't know. But he's not understanding what the class is doing and the socialization of this, whatever we're working on." (A.R. at 982–83.) Davis was asked: "So does he ever take any kind of active role as you say the other students are doing when you're doing the presenting?" She answered, "No, he's usually [self-stimulating] with his hand, hands and head [sic] or chewing on his clothes or just turning around and looking at the back of the room." (A.R. at 983.) Davis also testified about a recent art project in which D.F. had one-on-one assistance in using sponges to paint a tree in autumn. When the teaching assistant asked D.F. what he had made, he said "a pig." With repeated direction from the assistant, he finally said "a tree." The project required "hand-over-hand assistance," where the assistant would actually put her hand over his and he would use the sponge with that guidance. (A.R. at 984–85.)

Rebecca Bulawa, a school psychologist, also testified that D.F. could not satisfactorily meet most of his IEP goals in regular education classes. Cathy Radke, D.F.'s MoMH teacher for the 1990–91 and 1991–92 school years, testified that he would not benefit academically in a general education classroom. Andrea Heathcoat, D.F.'s music teacher, testified that she did not believe his IEP goals and objectives could be met in a general education music class. Linda Johns, D.F.'s art teacher, testified that his IEP goals and objectives could not be met in a general education art class. Mark Masariu, D.F.'s physical education teacher, testified that his IEP goals could not be met in a regular physical education class. All of these witness knew D.F. well and had worked with him closely.

Phyllis Craig, director of special services for the Kokomo Area Special Education Cooperative, testified that D.F.'s IEP goals and objectives could not be met in general education classes. She stated that D.F. required "very intense services." She stated in the supplemental affidavit submitted to this court that integration in an academic context, even with a wide variety of supportive services, is simply impossible. Craig believes that D.F. is unable to compete or benefit in the same academic environment as age-appropriate peers, regardless of the aids and supplemental services provided.

Gwen Chesterfield, an expert retained by plaintiffs, observed D.F. for a total of six hours and ten minutes over three days. She testified at the due process hearing and plaintiffs have submitted additional written reports to this court. She believes that D.F. would benefit from general education placement. She stated that D.F. could meet his IEP goals with the support of an assistant. Chesterfield also testified that in her view of integration, only "very rarely" would a child functioning at D.F.'s level not be appropriately placed in general education classes. Bradley Passenger, an expert retained by plaintiffs, observed D.F. for five hours and forty-five minutes over two days. Plaintiffs submitted to the court two written reports concerning his views of an appropriate placement for D.F. Passenger supported Chesterfield's position that D.F. could benefit from participation in general education environments.

The hearing officer carefully reviewed the testimony of these and other witnesses (except that Passenger did not testify at the hearing). The hearing officer concluded that the school "could not modify the regular classroom curriculum without changing it beyond recognition, and significantly detracting from the education of the rest of the class," and that D.F. "would not be able to master any of the regular education curriculum as his nondisabled classmates would." (A.R. at 199.) "The evidence was overwhelming that

[D.F.] would be engaged in entirely different academic activities than would his nondisabled peers...." *Id.*

These findings were clearly correct on the administrative record. Even the evidence from plaintiffs' expert supports them. Chesterfield explained the type of placement in a regular classroom that she believes would be appropriate. For example, she testified that a regular fourth grade class she visited was doing a science lesson on life in the oceans and had a worksheet showing water and land and a boat floating on the water. She suggested that during such lessons on life in the oceans, the teacher could ask D.F. to answer, for example, "What's the function of a boat?" (A.R. at 1264.) Or the lesson could provide an opportunity for D.F. to "work on color identification because water is usually blue on a map and land is usually green or brown." (A.R. at 1264–65.) In another example in her written report, Chesterfield considered a regular fourth-grade class lesson on Indiana history in which students identified which Indian tribes lived in which parts of Indiana, worked on map skills, and played a game about "Indian facts." Chesterfield suggested that this lesson be adapted for D.F. so that he would be asked to match identical names or symbols for different Indian tribes, to identify the top, bottom, right, and left sides of the map, to count how many teepees or huts are on the map, and to trace the state's borders on the map. (Pet. Ex. 7, A.R. at 341.)

Thus, given the evidence D.F.'s disabilities, the hearing officer was correct in finding that the regular classroom curriculum would have to be adapted beyond recognition to fit D.F.'s needs. Such efforts are not required in the name of mainstreaming. *Daniel R.R.,* 874 F.2d at 1050. Because he would need his own set of academic activities in a regular classroom anyway, there is no genuine issue of fact here as to whether D.F. would derive greater educational benefit from placement in a regular classroom, even with significant supplemental assistance.

**Non-academic Benefits:** Academic achievement is not the only purpose of mainstreaming. Disabled students can also benefit from exposure to their non-disabled peers.

For example, disabled students may benefit from language and behavior models provided by non-disabled students. School districts and courts must consider such possible benefits when deciding whether and to what extent mainstreaming is appropriate. See *Holland,* 786 F.Supp. at 879; *Daniel R.R.,* 874 F.2d at 1049.

Joni Sanders, a member of D.F.'s multidisciplinary team, testified based on her formal observations that D.F. does not model the behavior of other disabled students who are more advanced than D.F. (A.R. at 863–64.) Davis testified that D.F. does not model or imitate other students, nor does he actively interact with other students. (A.R. at 990.) Sara Rizer, a full-time paraprofessional in D.F.'s MoMH class testified that he does not model or mimic other students' behavior or language. Heathcoat testified that she has not seen D.F. modeling other students.

On the other hand, Chesterfield testified that general education placement would allow D.F. to model language and social skills from age appropriate peers. Passenger's affidavit and report state that D.F. had no opportunities at Pettit Park to interact with or model non-disabled students. Radke testified that D.F. did some mimicking of other students in her classroom, but her testimony does not provide substantial support for expecting positive modeling behavior from D.F. if he were in a regular classroom. (See A.R. at 1092–93.) D.F.'s mother testified that he has modeled negative behavior from other students in his MoMH class. (A.R. at 1386–89.)

Weighing this evidence, the hearing officer found it clear that D.F. "would not benefit enormously (*Daniel R.R.* language) or even appreciably (to use a lesser standard), in terms of modeling language and social skills from interacting with nondisabled peers in a regular classroom." (A.R. at 200.) After reviewing the evidence, the court agrees. To the extent that Chesterfield and Passenger disagree with that conclusion, the disagreement appears to be based more upon their more general experience and professional opinions and less upon their observations of D.F. Although these experts criticize the lack of opportunities for D.F. to model

speech and behavior of non-disabled children, the evidence as a whole shows that the opportunities D.R. has had, whether in convocations, on field trips, or other school activities, did not produce significant positive modeling. Giving any meaningful degree of deference to the hearing officer, there is no genuine issue of material fact on the modeling issue.

Also relevant to the possible non-academic benefits of a regular classroom placement is evidence concerning D.F.'s tendency to engage in self-stimulating behaviors. These consist of flapping his hands, shaking his head back and forth, and mouthing his hands and fingers. Davis testified that D.F. engaged in self-stimulating behavior very frequently. Radke testified that D.F. would be very distracting. When Passenger observed D.F. at Pettit Park, he noted self-stimulating behavior 75 percent of the time, for episodes lasting up to one hour. When Passenger observed D.F. at Sycamore, he noted greatly reduced self-stimulating behavior, lasting a total of thirty seconds. Karen Young, D.F.'s current teacher at Sycamore, indicated to Passenger that she was having difficulty managing her class of eight special education students. This problem arose whenever she was the only staff person with more than three students present or with D.F. and another student with significant needs present. Passenger's report noted that Young's classroom needed additional assistance beyond the one teacher and one assistant already assigned to cover eight students. He commented that D.F. needs individual assistance "several times throughout the day." Passenger's report indicates that D.F. tends to engage in self-stimulating behaviors during "down time," and most frequently when adults are present in the room but are not attending to him.

The record unambiguously shows that D.F. requires a great deal of one-on-one attention. This evidence is significant in evaluating the potential non-academic benefits to D.F. from being in a regular classroom. The hearing officer commented that much of the evidence indicated that placing D.F. in a regular classroom would be detrimental to him. The evidence showed that D.F. engages in self-stimulating behavior frequently when he is not getting lots of attention from an adult. If D.F.'s teachers in small special education classes cannot give him enough attention (at least to satisfy plaintiffs' experts), it is not reasonable to expect a teacher in a regular classroom to do so. Of course, school officials must also consider whether supplemental services and aids could allow a handicapped child to benefit from placement in a regular classroom. A teaching assistant with responsibility for focusing primarily upon D.F. would be one possible solution for the problem presented by D.F.'s limited attention and tendency for self-stimulating activity.

However, both Chesterfield and Passenger contend that extensive one-on-one attention in a regular classroom would *not* be appropriate because it would tend to isolate D.F. from other students. (A.R. at 339.) The hearing officer stated: "[H]ow would the legitimate I.E.P. goal of decreasing [D.F.'s] self-stimulation activity be met in a regular classroom unless he had a full time aide at his side, at all times, to cue and prompt him to stop?" In the words of Petitioner's expert witness, Gwen Chesterfield, this sort of constant one-to-one support would "isolate [D.F.] and make him a visitor in the classroom." In light of this evidence of D.F.'s needs for individualized attention in his special education classes and his probable limitations in dealing with a regular classroom, and again giving any meaningful degree of deference to the hearing officer, the plaintiffs have failed to raise a genuine issue of material fact as to whether D.F. would derive significant non-academic benefit from placement in a regular classroom.

The foregoing analysis shows that there is no triable issue as to the two *Holland* factors that address the possible benefits of mainstreaming for the child with disabilities. Where those two factors point against more extensive mainstreaming, it should not be necessary to go on to deal with possible countervailing factors, such as possible negative effects on education of other children in the regular classroom or the cost

of a proposed program.[3] To return to the standard of *Daniel R.R.*, the first part of the test is whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for the child. The evidence here shows, as the hearing officer found, that such mainstreaming cannot be achieved satisfactorily in this case. That conclusion raises the second question under *Daniel R.R.*, whether the school has mainstreamed the child to the maximum extent appropriate. The hearing officer considered evidence about mainstreaming of D.F. in lunch, convocations and assemblies, recess, and heard extensive evidence about D.F.'s needs for special educational assistance in physical education, art, and music. His conclusion that the school had mainstreamed D.F. to the maximum extent appropriate is correct. In this case, plaintiffs are not disputing the details of these arrangements but are asking that D.F. be assigned to a regular fourth grade class (for the 1993–94 school year) for essentially all purposes. The hearing officer correctly found that the defendants' decision not to make such a placement was consistent with the IDEA, which requires schools to balance the preference for mainstreaming against the need for individual educational programs tailored to the special needs of the child.

The IDEA does not require mainstreaming to the maximum extent possible or to the maximum extent conceivable. It requires mainstreaming to the maximum extent appropriate. Mainstreaming is an important element of education for disabled children, but the IDEA does not permit, let alone require, a school district to mainstream a student where the student is unlikely to make significant educational and non-academic progress. *E.g., Board of Educ. of Murphysboro*, 41 F.3d at 1168 (despite "admirable goal" of allowing child to interact with nondisabled peers, school district violated IDEA where student did not derive the minimum educational opportunities required by statute). Considering the facts before the court, and giving due deference to the hearing officer's decision and expertise in matters of educational policy, the court finds that plaintiffs have failed to raise a genuine issue of material fact on the question whether defendants mainstreamed D.F. to the maximum extent appropriate.

### Education in Home School District

Plaintiffs also argue that the IDEA requires defendants to place D.F. in a school within his home district. They correctly note that the IDEA's implementing regulations express a preference for placing disabled children as close as possible to their homes. 34 C.F.R. §§ 300.552(a)(3) & 300.552(c). However, the regulations do not require placement in the neighborhood school; they state a preference for local placement. See, *e.g., Schuldt v. Mankato Indep. Sch. Dist. No. 77*, 937 F.2d 1357 (8th Cir.1991); *Straube v. Florida Union Free Sch. Dist.*, 801 F.Supp. 1164, 1177 (S.D.N.Y.1992); *Fischer v. Rochester Comm. Sch.*, 780 F.Supp. 1142,

**3.** The hearing officer noted little evidence was "explicitly introduced" concerning the extent to which D.F.'s presence in a regular classroom would disrupt the class for other children. He therefore gave "no weight" to this factor. Because the first two *Holland* factors point against further mainstreaming for D.F.'s sake, the court does not disagree with the hearing officer's choice not to base his decision on this ground. However, there is substantial indirect evidence on the likely effects on the education of other children. As the evidence indicated, the curriculum of a regular classroom would have to be modified beyond recognition for D.F. to derive educational benefit from it. In addition, D.F. frequently engages in self-stimulating behavior when he is not the subject of close individual attention from his teachers. This picture adds up to D.F. needing a virtually full-time teacher or teaching assistant in a regular classroom working with him on a curriculum dramatically different from, if essentially parallel to, the other children's curriculum. While that scenario might not be unduly disruptive or distracting, that is not what plaintiffs are seeking here. Both of plaintiffs' experts oppose giving D.F. too much attention from a full-time aide in a regular classroom because they are concerned that such attention would tend to isolate D.F. from other students and make him seem to other children like a visitor in their classroom. As the Fifth Circuit explained in *Daniel R.R.*, the IDEA "does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition." 874 F.2d at 1048.

The fourth *Holland* factor is cost, and the administrative record contains no findings relative to the costs of educating D.F. in a regular education classroom at his neighborhood school.

1150 (E.D.Mich.1991). These regulations have been interpreted to require placement of a disabled child in her neighborhood school unless the child's IEP requires otherwise. *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 929 (10th Cir.1995). Therefore, the content of D.F.'s IEP remains at the heart of the matter. The physical location of Pettit Park outside his home school district adds nothing to D.F.'s challenge of the hearing officer and Board of Special Education Appeals decisions.

### Compliance with IDEA Procedural Requirements

 Plaintiffs argue that defendants failed to comply with the procedural requirements of the IDEA and the Indiana regulations because "[n]o serious consideration has ever been given to any placement other than full-time moderately mentally handicapped (MoMH)." The issue is important because the IDEA's strong preference for mainstreaming requires school officials to think flexibly and creatively about how best to balance that preference with the needs of the child. See *Oberti,* 995 F.2d at 1216; accord, *Daniel R.R.,* 874 F.2d at 1048 ("The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad."). However, the IDEA does not require schools in every case to try out a regular classroom placement that is likely to be unsuccessful and detrimental for the child.

Phyllis Craig's testimony before the hearing officer lends some support to plaintiffs' argument on this point. Craig noted that the case conference reports and IEPs did not always document that general education classes using supplementary aids and services could not be satisfactorily achieved. (A.R. at 1198–99, 1208.) However, in her affidavit submitted to the court, Craig stated, "Throughout the 1994–95 school year and prior school years we have attempted to accommodate [D.F.] and his parents with respect to all of their requests for integration." (Craig Aff. ¶ 4.) The IEPs completed for D.F. support Craig's description of attempts to determine the least restrictive environ-

ment appropriate for him. (See A.R. at 618–19, 626–30, 632–35, 644–48, 655–61.)

The hearing officer directly addressed the IDEA's procedural requirements in Findings of Fact 8, 9, and 10. He noted that the annual review report dated April 24, 1991, and the case conference committee reports dated September 18, 1991, and May 18, 1992, all considered alternative placements, including general · education placements. The Hearing Officer noted that the May 14, 1993, case conference committee report also documents that general education placement and other alternative placements were considered. The August 24, 1993, case conference committee report indicates that the parties discussed implementing D.F.'s IEP in a general education classroom and discussed placement in a special education classroom with integration into general education classes for non-academic subjects. Moreover, the defendants took a number of steps to mainstream D.F. into a variety of general education settings. Over the years he has participated in general education lunch, music, art, physical education, oral reading, hall passing, and convocations. These mainstreaming steps could not have been taken in the absence of serious consideration of appropriate placement for D.F.

These findings directly and adequately address plaintiffs' arguments concerning procedural compliance with the IDEA and related state laws. Plaintiffs have failed to satisfy their burden of proof on this issue. The hearing officer correctly pointed out that there is no requirement that school districts first place students with serious disabilities in general education settings and then wait for them to fail before removing them. Instead, the potentially harmful effects of a general education placement must be considered on an individual basis before any placement decision is made.

 Plaintiffs also contend that the defendants violated the IDEA by unilaterally changing the goals and objectives in D.F.'s individual educational plan in 1993. The evidence shows that D.F.'s mother proposed some specific goals and objectives for the IEP in a case conference and that the defendants made some changes in the wording of

her goals and objectives in preparing the written form of the IEP. Several of the changes were deletions of some specific teaching methods that D.F.'s mother had suggested for achieving the goals. Defendants deleted the suggested methods for formal reasons, because the goals and objectives portion of an IEP is not, at least in their practice, an appropriate place to explain or select teaching methods. These formal changes did not violate the IDEA. (See A.R. at 1359 (D.F.'s mother understood that methods would not be included in goals).)

When the defendants prepared a written IEP, plaintiffs' suggested references in goals to "age-appropriate" peers were not included. (See A.R. at 1359–62.) The evidence shows that the plaintiffs believed they had reached an oral agreement with defendants at the 1993 case conference on goals for D.F.'s IEP, but not for the proper placement. The hearing officer found that the parties did not in fact reach any agreement on the extent or nature of goals for including D.F. with nondisabled age-appropriate peers. (A.R. at 201.) That finding is clearly correct. All parties agree that they disagreed over whether D.F. should continue in the MoMH class at Pettit Park or should instead be moved to a regular fourth grade classroom in his home school district. That disagreement is the central dispute in this case. There is no reason to believe that defendants agreed in the conference to goals that would have required (either explicitly or implicitly) the same mainstreaming placement that plaintiffs were seeking and defendants had refused. It is far more likely that the perceived agreement on goals was based on a misunderstanding about the precise extent of the agreement. Giving due deference to the hearing officer, there is no genuine issue of material fact as to whether the defendants unilaterally changed the goals of D.F.'s 1993–94 IEP.

**ADA and Rehabilitation Act Claims**

 In addition to IDEA claims, plaintiffs assert claims based on defendants' alleged violations of the Rehabilitation Act

and the Americans with Disabilities Act. Plaintiffs correctly point out that the IDEA is not an exclusive remedy. 20 U.S.C. § 1415(f). The ADA and the Rehabilitation Act aim to curtail unlawful discrimination against disabled individuals. Plaintiffs' Rehabilitation Act and ADA claims allege statutory violations based on D.F.'s placement in a MoMH program at Pettit Park. Both the Rehabilitation Act and the ADA apply to D.F. The issue, however, is whether the Rehabilitation Act and ADA grant D.F. any rights in this situation beyond those granted by the IDEA. They do not.

The Rehabilitation Act states:

No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794. D.F. is a qualified individual with handicaps. To be a qualified individual with handicaps in the context of public education, the regulations provide that persons must only be of an age at which nondisabled persons are provided such education. See 34 C.F.R. § 104.3(k)(2). D.F., born February 24, 1983, with serious handicaps, meets this test. Defendants receive federal financial assistance for their educational programs. The remaining issue is whether D.F. has been unlawfully excluded from participation in one of defendants' programs. D.F. argues that he has been unlawfully excluded from the general education program at his neighborhood school.

The regulations implementing the Rehabilitation Act precisely mirror the IDEA's provisions requiring education in the least restrictive environment appropriate.[4] The pertinent regulations provide that qualified individuals with handicaps must be educated with nonhandicapped persons "to the maximum extent appropriate to the needs of the handicapped person." 34 C.F.R. § 104.34(a). The court has determined above that defendants are entitled to summary judgment on

---

4. In fact, pertinent regulations provide that one way to comply with the Rehabilitation Act's requirement of providing a free appropriate public education is to implement an IEP developed in accordance with the IDEA. See 34 C.F.R. § 104.33(b)(2).

D.F.'s IDEA claim, finding that plaintiffs have failed to meet their burden of proving that D.F.'s placement at Pettit Park violated the IDEA. Thus, plaintiffs also lack the evidence needed to support a Rehabilitation Act claim.

D.F.'s complaint also includes a count based on the ADA. The ADA prohibits discrimination against qualified individuals with disabilities, as defined in 42 U.S.C. § 12111(8). Plaintiffs allege that defendants have violated the following provision:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. They argue that D.F. has been improperly excluded from general education classes in his neighborhood school on the basis of his disability. This claim centers on the issue of whether D.F. meets the definition of a qualified individual with a disability. The qualified individual with a disability analysis hinges on whether D.F. can be satisfactorily educated in a general education environment with supplemental aids and services. D.F.'s ADA claim must fail for the same reason that his IDEA and Rehabilitation Act claims fail: he has failed to meet his burden of proof in challenging the Hearing Officer's decision that defendants have integrated him into general education environments to the maximum extent appropriate.

Other courts entering summary judgment on IDEA claims have summarily dismissed accompanying Rehabilitation Act and ADA claims. See, *e.g., Hudson v. Bloomfield Hills Pub. Schs.*, 910 F.Supp. 1291, 1306–07 (E.D.Mich.1995); *Tarah P. v. Board of Educ. of Fremont Sch. Dist. 79*, No. 94 C 3896, 1995 WL 66283, at *4 (N.D.Ill. Feb. 15, 1995); *Scanlon v. San Francisco Unified Sch. Dist.*, No. C 91–2559 FMS, 1994 WL 860768, at *10–11 (N.D.Cal. Apr. 14, 1994), *aff'd mem.* 69 F.3d 544, 1995 WL 638275 (9th Cir.1995). Because plaintiffs have failed to meet their burden of proving that D.F.'s IEP violated the IDEA, their claims based on the ADA and the Rehabilitation Act must also fail.

Defendants are entitled to summary judgment on the IDEA claim because there is no genuine issue of material fact as to whether D.F. has been placed in the least restrictive environment appropriate. Since the least restrictive environment requirements in the Rehabilitation Act and ADA mirror those provisions found in the IDEA, defendants are also entitled to summary judgment on those counts.

### Conclusion

The defendants are entitled to summary judgment on plaintiffs' IDEA, Rehabilitation Act and ADA claims. Plaintiffs have failed to raise a genuine issue on the crucial claim that defendants have failed to place D.F. in the least restrictive environment appropriate. Judgment will be entered accordingly.