**Wesley NEIN and Denise Nein, Plaintiffs,**

v.

**GREATER CLARK COUNTY SCHOOL CORPORATION, Defendant.**

No. NA99–0096–C–H/G.

United States District Court, S.D. Indiana, New Albany Division.

April 17, 2000.

Kyle P. Williams, Wilder Lewis & Williams, Jeffersonville, IN.

Thomas E. Wheeler II, Bose McKinney & Evans, Indianapolis, IN.

ENTRY ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

HAMILTON, District Judge:

This case arises under the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* The central issues are: (a) whether a public school corporation has provided minimally adequate educational services for a child with disabilities, and (b) if the public school corporation failed to do so, whether the public school corporation should be required to pay for expenses of a private school after the child's parents decided unilaterally to take him out of the public school and enrolled him in a private school.

As explained in detail below, the court finds that the public school corporation, defendant Greater Clark County School Corporation, failed to meet its obligation under the IDEA to provide minimally adequate educational services to Lucas Nein. Lucas suffers from a serious case of dyslexia, a learning disorder that makes it difficult for him to learn to read. Tests when he was a first grader indicated that Lucas was a child of generally average intelligence. As a fourth grader, however, and after three years of Greater Clark's special education services supposedly tailored to address Lucas's needs, he still could not read. He could not even read signs to know which public restroom he should use. Moreover, tests indicated that his IQ had dropped an astonishing 20 points, from 95 to 75. There is much more evidence, of course, but those points are symptoms of the problem here.

Unhappy with Lucas's lack of progress after three years of special education with Greater Clark, Lucas's parents placed him in a private school that specializes in teaching children with dyslexia. On the issue of reimbursement, the court finds that Lucas's parents failed to notify Greater Clark that they intended to place Lucas in the private school at public expense. Under the 1997 amendments to the IDEA, the court may consider their failure to

provide that notice as a factor in limiting reimbursement to which they might otherwise be entitled. See 20 U.S.C. § 1412(a)(10)(C)(iii). The court therefore exercises its discretion under that provision to award Lucas's parents one half of the cost of expenses for the private school summer program and the 1998–99 school year, plus the full cost of one year of compensatory education at private school, plus half of the family's reasonable cost of transportation to the school for those two years.

*Background*

Plaintiffs Wesley and Denise Nein are the parents of Lucas Nein, who is now twelve years old. From kindergarten through fourth grade, Lucas attended Parkwood Elementary School, a facility owned and operated by defendant Greater Clark County School Corporation. During his first grade year, an educational evaluation revealed that Lucas had a severe learning disability. Lucas was therefore eligible to receive special education services under the IDEA as a student with a learning disability.

The IDEA is designed to "assess, and ensure the effectiveness of, efforts to educate children with disabilities." 20 U.S.C. § 1400(d)(4). Under the IDEA, the federal government awards grants of federal funds to state governments to help provide special education services. 20 U.S.C. § 1411(a). As a condition of receiving federal grant money, states must ensure that their public schools provide children with disabilities " 'a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living.' " *Morton Community Unit School Dist. No. 709 v. J.M.*, 152 F.3d 583, 584 (7th Cir. 1998), quoting 20 U.S.C. § 1400(d)(1)(A). However, the IDEA does not specifically define an "appropriate public education" or explain how one is to measure whether a student has received one.

The IDEA also requires public school districts to design an individualized education program (IEP) for each child receiving special education services. 20 U.S.C. § 1414(d)(1)(A). An IEP must contain statements regarding the student's present educational level, the student's measurable annual goals, the special education services to be provided, the extent to which the student will participate in the classroom with non-disabled students, and a timetable for providing the identified education services. School districts are required to review and revise a student's IEP periodically to meet changing educational needs.

Pursuant to the IDEA, Greater Clark developed an IEP for Lucas each year for his second through fifth grade years and provided him with special education services each year. Lucas's parents, however, became increasingly unhappy with his lack of progress and believed that Greater Clark had failed to provide him with a free appropriate public education. In April 1998, when Lucas was in fourth grade, and according to certain procedural safeguards under the IDEA, the Neins requested a due process hearing to address Lucas's educational needs. After hearing three days of testimony, the initial hearing officer found that Greater Clark had failed to provide Lucas with a free appropriate public education. The initial hearing officer ordered Greater Clark to pay the Neins for two years of compensatory education, which would be provided at The de Paul School (a private school in Louisville, Kentucky, where the Neins had enrolled Lucas) unless Greater Clark was able to show it could provide teachers with appropriate training to successfully teach dyslexic students. Greater Clark appealed this decision to the Indiana Board of Special Education Appeals ("the Board of Appeals"). By a 2–1 vote, the Board of Appeals reversed the initial hearing officer's decision. The Neins then petitioned this court for judicial review of the Board of Appeals' decision. Both sides have moved for summary judgment.

## Standard of Review

■ Judicial review under the IDEA is something of a hybrid of more familiar forms of judicial decision-making, somewhere between trial *de novo* and "substantial evidence" review of a closed administrative record. See *Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir. 1997); *D.F. v. Western School Corp.,* 921 F.Supp. 559, 564 (S.D.Ind.1996). The IDEA provides that a district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

■ The parties have filed with this court the record from the administrative proceedings. Neither party has asked the court to consider additional evidence. Without any additional evidence, a motion for summary judgment is "simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S.,* 125 F.3d at 1052, quoting *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). Unlike the decision on a usual motion for summary judgment, however, "the district court's decision is based on the preponderance of the evidence." *Patricia P. v. Board of Education of Oak Park,* 203 F.3d 462, 466 (7th Cir.2000).

■ The statute's general language is not, however, "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In deciding cases under the IDEA, a court must give "due weight" to the determinations of the administrative hearing officers and may not substitute its "own notions of sound educational policy for those of the school authorities." *Heather S.,* 125 F.3d at 1052–53 (citations omitted).

However, "due weight" does not mean abdication of all judicial function. See *Patricia P.*, 203 F.3d at 466 (district court must "independently determine whether the requirements of the Act have been satisfied"), quoting *Board of Education of Murphysboro v. Illinois Board of Education*, 41 F.3d 1162, 1166 (7th Cir.1994); *Morton Community Unit School Dist. No. 709 v. J.M.*, 152 F.3d at 588) ("we do defer, though of course not abjectly, to the view of hearing officers as to what services a disabled child is entitled to under the IDEA"). The court is permitted to "take an independent and critical look at the evidence" and the administrative decision, but must always keep in mind that educational policy decisions and choices between competing educational theories and methods are generally best left to school authorities who have considered the facts carefully and have made a reasonable decision in light of those facts. See *D.F. v. Western School Corp.*, 921 F.Supp. at 565; accord, *Adams v. State of Oregon*, 195 F.3d 1141, 1145, 1150 (9th Cir.1999) (deferring to hearing officer's "thorough findings of fact" regarding the adequacy of a child's educational plan and noting that "the amount of deference bestowed upon the hearing officer is increased where her findings are 'thorough and complete' "), quoting *Union School District v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994); *Walczak v. Florida Union Free School District*, 142 F.3d 119, 127–29 (2d Cir.1998) (explaining that deference to administrative decisions is "particularly appropriate" when "the state hearing officers' review has been thorough and careful;" hearing officer had carefully reviewed evidence at the hearing, and on appeal the state review officer had "meticulously reviewed the evidence developed in the administrative hearing").

■ When decisions of the initial hearing officer and the state's reviewing authority conflict, as in this case, federal courts must defer to the final decision of the state authorities, in this case the Board of Appeals. *Board of Education of La-Grange School District v. Illinois State Board of Education*, 184 F.3d 912, 915 (7th Cir.1999), citing *Heather S.*, 125 F.3d at 1052. Because the Neins are challenging the outcome of the state administrative decision, they bear the burden of persuasion. See *Heather S.*, 125 F.3d at 1052, citing *Board of Education of Community Consol. School Dist. 21 v. Illinois State Board of Education*, 938 F.2d 712, 716 (7th Cir.1991).

### *Facts from the Administrative Record*

#### I. *First Grade (1994–95 School Year)*

In 1994, Lucas was enrolled in the first grade at Parkwood Elementary School. His teacher was Deanna Maupin. R. 404. Ms. Maupin testified at the due process hearing that when Lucas started the first grade, he "demonstrated skills that were below where the other children were. It was a struggle from the very beginning of school." R. 405. In Ms. Maupin's opinion, the grade level at which Lucas was functioning when he entered the first grade was "probably the middle of kindergarten." R. 409. Lucas received special assistance during the year, including adaptations in language arts and mathematics (oral spelling tests and extra time to complete assignments), tutoring assistance three times a week, peer tutors twice a week, and a peer prompter daily. R. 1144.

After conferring with Lucas's mother, Ms. Maupin decided to send Lucas for a special education referral. R. 406–07. On November 23, 1994, Ms. Maupin completed a formal request for such a referral, stating that an educational evaluation was needed to "rule out learning disabilities, mental retardation and ADHD." R. 1114.

On March 7, 1995, and May 1, 1995, an educational evaluation of Lucas was conducted by Dr. Anne M. Claypool, Greater Clark's school psychologist, and Janet Lackey, an educational diagnostician. R. 1161–67. On the Wechsler Intelligence Scale for Children—III, a measure of general intellectual ability, Lucas's full scale

score was 95. R. 1163. This score fell in the average range. When questioned about this score at the due process hearing, Dr. Claypool explained that the score indicated Lucas had "the gray matter to be able to process appropriately" and to learn. R. 454.

The evaluation also revealed that Lucas's visual-motor integrative abilities and his math achievement were average. R. 1164. However, his overall performance on the Woodcock–Johnson Tests of Achievement—Revised, which assessed his skills in the areas of letter-word identification, word attack, and comprehension, "suggested skills significantly below the average range based on age level comparisons." *Id.* In summary, the evaluators noted: "At this time, Lucas demonstrates characteristics of individuals who have a learning disability. A significant discrepancy between ability and achievement is evident in the area of reading." *Id.*

Also in March 1995, Lucas took the IS-TEP test, an achievement test given to all Indiana students at various times during their academic careers. R. 1072. A note from his special education teacher indicated that his test scores were ultimately "invalidated" because Lucas "cried through the 1st day of testing. He was a non-reader & totally frustrated by tests." R. 1072, 721.

A case conference between Mrs. Nein and school personnel was held on May 24, 1995, to discuss Lucas's testing results and to develop an IEP for Lucas. R. 1170–86. The IEP for the 1995–96 school year contained the goals of increasing Lucas's reading, written language, and spelling skills, and provided that Lucas receive two hours of specialized assistance per day in reading and language arts. R. 1172. It also provided for a number of classroom adaptations for Lucas, including oral reading of tests, reducing the number of test items, creating a modified grading scale, providing extra time to complete assignments, and small group instruction. R. 1177. After receiving a proper Notice of Parent Rights, Mrs. Nein consented to Lucas's IEP for the 1995–96 school year. R. 1178–86.

## II. *Second Grade (1995–96 School Year)*

During Lucas's second grade year, Ms. Hoeppner provided the special education assistance identified in his IEP. Ms. Hoeppner has a Bachelor's Degree in Elementary Education and a Master's Degree in Special Education with Severe Disabilities. R. 646. She also has endorsements in Learning Disabilities, Mild Disabilities, and Emotional Disabilities. *Id.* She has not had any training specifically addressing how to work with dyslexic children. R. 723.

It was Ms. Hoeppner's responsibility to develop a curriculum and/or methodology to implement the goals stated in Lucas's IEP. R. 726. Ms. Hoeppner began using the Milestones Program in working with Lucas on his reading skills. R. 660. The Milestones Program is a reading series based on a limited vocabulary. It is designed for use with students who have learning disabilities. It begins at the pre-primer level and continues through the fourth grade level. *Id.* The reading series is accompanied by flash cards, a workbook, and a spelling series. R. 662. The first story introduces three words, and each story adds three or four more words, with the series building on these words. *Id.* Ms. Hoeppner and Lucas made flash cards, did the accompanying workbook, and read together in this reading program. R. 663. Ms. Hoeppner also made a reading folder for home workbook pages and his reading book, and she asked that Mrs. Nein read with Lucas for fifteen minutes each night. R. 663–64.

After completing a book in the Milestones series, Lucas was tested to see whether he had learned the words in the book and had mastered the skills taught in the book. R. 665. By the end of second grade, Lucas had completed the pre-primer level books and was reading at the

primer level. R. 668. Ms. Hoeppner opined at the due process hearing that the Milestones primer level was about "mid first grade" level. *Id.*

### III. *Third Grade (1996–97 School Year)*

A case conference was held on March 14, 1996, to develop an IEP for Lucas for his third grade year. R. 1240. Mrs. Nein participated in this conference, acknowledged receiving notice of her parental rights, and approved of Lucas's third grade IEP. R. 1243, 1249–56. Lucas's IEP again provided for two hours of special education assistance each day in his regular classroom. R. 1241. In addition to the continued goals of increasing Lucas's reading, written language, and spelling skills, the third grade IEP contained the goal of increasing Lucas's math skills. R. 1246. It also provided for the continued use of classroom adaptations, including shorter assignments, small group instruction, the oral reading of quizzes and tests, and use of a modified grading scale. R. 1247.

In September 1996, Lucas again took the ISTEP achievement test. The test was read to him. R. 1072. Ms. Hoeppner testified that Lucas continued in the Milestones reading program during the third grade because he "was having a lot of success" and "was building on the vocabulary that he had already learned." R. 676. By the end of his third grade year, Lucas had again completed another series in the Milestones Program. Ms. Hoeppner testified that Lucas had made "approximately a half a year's progress" and that he was reading at the "early second grade" level at the end of his third grade year. R. 680.

### IV. *Fourth Grade (1997–98 School Year)*

A case conference was held on March 16, 1997, to develop an IEP for Lucas for his fourth grade year. R. 1298. Mrs. Nein participated in this case conference, acknowledged receiving notice of her parental rights, and approved Lucas's fourth grade IEP. R. 1302, 1297. This IEP increased Lucas' time in special education to full time, providing him with two and a half hours of special education support per day. R. 1300–01. The four goals from the previous year were continued, with an increased focus on reading comprehension and introduction of the Target Spelling Series. R. 686, 1304–05. The IEP also provided for a number of teaching adaptations and curriculum modifications, such as allowing Lucas more time to complete tasks, shortening his assignments, allowing tests and quizzes to be read orally or taped for him, and creating a modified grading scale. R. 1306. Lucas was also assigned a peer "buddy" to work with him in the regular classroom when he was not receiving direct special education services. R. 700.

The Neins were frustrated by Lucas's lack of progress, especially in reading, and on January 10, 1998, the Neins obtained independent academic and diagnostic testing for Lucas at The de Paul School in Louisville, Kentucky. R. 1418. The de Paul School specializes in working with students who suffer from dyslexia. R. 838. The new testing indicated that Lucas's oral reading skills were below second grade level, that his arithmetic skills were at third grade level, and that his spelling abilities were at first grade level. R. 1418.

On January 26, 1998, the Neins requested that a case conference be convened to address their concerns that Lucas was falling further and further behind his peers in certain subjects. R. 1318. This was the first case conference meeting to be attended by Mr. Nein.[1] At the confer-

---

1. The Neins are divorced. Mrs. Nein has had custody of Lucas and took primary responsibility for overseeing his education. She agreed to all IEPs for Lucas before the program proposed for the fifth grade. Greater Clark contends this case is an example of a non-custodial parent trying to revisit decisions in which he had previously declined to become involved. Def. Br. at 31 n. 15. The court recognizes the problem, but Greater Clark's criticism of Mr. Nein ultimately has nothing to do with whether Greater Clark

ence, Mr. Nein said he was concerned because "Lucas can't read and is not progressing fast enough." R. 1330. He also reported that he had taken Lucas to be evaluated by The de Paul School and that the evaluation had revealed Lucas's intellectual functioning was well below average and below expected levels of academic performance. R. 1331, 1345. The Neins requested that Lucas undergo another psycho-educational evaluation, including a social/emotional evaluation to determine his frustration level and anxiety, and an evaluation for attention deficit concerns. R. 1319. Additionally, the Neins requested that recommendations be made regarding specific strategies to be implemented to assist Lucas, particularly in the area of reading. Lucas was due to be tested in March 1998 pursuant to state guidelines for triennial evaluations. The conference attendees agreed to have Lucas re-evaluated. R. 1332.

Lucas was evaluated on February 9 and 19, 1998, by Dr. Anne Claypool, Greater Clark's school psychologist, and by Phyllis Manners, an educational diagnostician. R. 1344. On the Wechsler Intelligence Scale for Children—III, Lucas achieved a full scale score of 75, which fell within the below average range. R. 1345. This score was also 20 points lower than his 1995 score of 95 on the same test. At the due process hearing, Dr. Claypool commented on this score discrepancy and explained that the lower score "sends up a flag to me like what is going on with this kid." R. 534. However, she also testified that she "just let this piece go as he wasn't on top of his game that day when he was doing testing." R. 505. There is no indication that she had the test repeated or determined that the score was invalid.

Other tests indicated that Lucas had "significant anxiety but an overall positive self-concept," and that he did not have "significant attentional difficulties." R. 1346. Lucas's achievement on tests evaluating his reading skills and comprehension "fell significantly below the average range based on age level comparisons." *Id.* His achievement on tests evaluating his written expression abilities and his mathematical reasoning and calculation abilities "fell in the below average to significantly below average range based on age level comparisons." R. 1347, 1348. The examiners also noted that Lucas's significant anxiety might have been related to his learning difficulties and that his distractibility during the testing might have resulted in "conservative" estimates of his abilities. R. 1349.

After Lucas's evaluation, a case conference was held on April 6, 1998, to discuss the evaluation results and to develop an IEP for his expected fifth grade year (1998–99) at Parkwood Elementary. R. at 1393. Both Mr. and Mrs. Nein attended the conference. *Id.* This IEP contained annual goals to increase Lucas's reading skills, written language skills, and math skills "by six months," but it did not provide for the use of any specific techniques designed to address his dyslexia. R. 1396. The IEP again provided for Lucas to receive special education services for two and a half hours a day. R. 1397. After receiving a copy of the school's Notice of Procedural Safeguards (Parental Rights), Mrs. Nein signed the IEP. R. 1399.

At the end of Lucas's fourth grade year, he had completed another level of books in the Milestones program. Ms. Hoeppner testified at the due process hearing that Lucas was reading at the "late second grade level." R. 694. The IEP developed for Lucas's fifth grade year noted that although Lucas had "a 6 month progress

actually provided a free appropriate public education to Lucas. It is not unreasonable for parents of disabled children (like courts) to defer to the presumed expertise of school officials to give time for their programs to work. Parents' patience does not estop them from asserting later that it is time to change direction. In addition, the court does not see that the Neins have gained any tactical or strategic advantage in this dispute by reason of Mr. Nein's late entry into the discussions with Greater Clark.

in reading" during his fourth grade year, he had difficulty "generalizing" the words from his Milestones reading program to other "locations" or reading materials. R. 1404.

On April 24, 1998, and pursuant to IDEA procedures, the Neins requested a due process hearing to address Lucas's educational placement. R. 1423. Attorney Jerry L. Colglazier was appointed as the initial hearing officer. R. 1422. After a May 12, 1998, pre-hearing conference, the initial hearing officer ordered Greater Clark to pay for another diagnostic evaluation and a psychological assessment.

The psychological assessment was conducted by Dr. Jan Eglen on May 28, 1998. R. 1426. Dr. Eglen found that Lucas's test scores indicated "possible mixed learning and/or other developmental disabilities," that he demonstrated some attention deficits, that he needed "appropriate boundary setting" and to learn self-discipline, and that he needed to participate in group or peer activities to enhance teamwork and sharing. R. 1431–32. Dr. Eglen also recommended that Lucas be further evaluated by a reading specialist, that he have comprehensive hearing and visual examinations, and that he be examined by a pediatric neurologist.

When questioned at the due process hearing about his examination of Lucas, Dr. Eglen testified that he wondered if Lucas lacked the "fundamental tools of being able to learn." R. 991. He opined that Lucas "may not be teachable" and that he "might be doing the very best of which he's capable of doing." R. 991–92. Dr. Eglen also testified, however, that these opinions were "conjectural" because he did not think he had enough evidence to reach firm conclusions R. 1003–04.[2]

The Neins enrolled Lucas in The de Paul School summer program for six weeks during the summer of 1998. The de Paul School Headmaster testified at the due process hearing that the school was "designed from the beginning to work with students with a specific learning disability, which we refer to as dyslexia." R. 838. He explained that the school offers "programs for students who are capable, who show average to above-average intellect, but due to processing difficulty show variability in academic performance, who show specific needs in terms of organizational skills, attentiveness, ability to organize space and time." *Id.* Students are grouped according to achievement level, and students "do a wide variety of activities that are very multi-sensory, hands-on." R. 845, 841. During his time at The de Paul School, Lucas received four periods of language arts a day (phonics, oral reading, writing skills, and grammar skills), two periods of math, and one period of social skills. R. 841–42.

Lucas completed a series of tests at the beginning of The de Paul School summer program and again at the end of the program. R. 1440. A comparison of the test results indicated that Lucas made some "overall gains" in four out of five subject areas. The de Paul School recommended that Lucas be enrolled in its program for the 1998–99 school year, R. 1440, and the Neins decided to enroll Lucas for that year.

On August 31, 1998, the diagnostic evaluation ordered by the initial hearing officer was performed by staff members at the Cleveland Clinic Foundation in Cleveland, Ohio. R. 1442. The results of Lucas's evaluation were compiled by Karen E. Dakin, an education diagnostician at the Cleveland Clinic Foundation. Ms. Dakin, an expert on dyslexia, reported that "Lu-

2. Greater Clark places great emphasis on Dr. Eglen's pessimistic view, citing this as "Perhaps the most telling testimony on the educational benefit issue, and certainly testimony that affected the [Board of Appeals'] decision." Def. Br. at 30–31 & n. 14. In fact, both the initial hearing officer and the Board of Appeals agreed that Dr. Eglen's pessimistic view was "conjectural." Greater Clark's heavy emphasis on that conjecture is not entitled to any weight.

cas is a child of average ability who is severely learning disabled and meets the criteria for language processing and articulation disorders, as well." R. 1450. Ms. Dakin also reported that "Lucas is achieving similar to a typical child at the middle of first grade in his basic reading skills, achieving moderately below potential and close to two standard deviations below his overall ability." *Id.* His reading comprehension was slightly higher (beginning of second grade), while his math calculation and problem solving achievement was in the third grade range. His written language skills were considered his weakest academic area (middle of first grade), and spelling was a significant handicap. To address Lucas's disabilities, Ms. Dakin recommended "direct teaching using multisensory, structured, sequential techniques" that "directly teach the sound-symbol relationship and the blending of individual phonemes into syllables." *Id.* She also recommended specific teaching techniques for use with Lucas. R. 1451–54.

After receiving these evaluations from the Cleveland Clinic, Greater Clark convened another case conference on October 27, 1998. R. 1464. Mr. and Mrs. Nein both attended this conference. The results of the examinations performed by Dr. Claypool, Dr. Eglen, and Karin Dakin were all discussed, along with Lucas's academic performance in The de Paul School summer program and his academic performance during his fourth grade year at Parkwood Elementary. R. 1466–82. The IEP designed for the 1998–99 school year proposed to increase the amount of time Lucas received special education services and included several goals for improving Lucas academic performance by either six or nine months. R. 1484–93. The proposed IEP did not provide for a direct teaching reading program using an individualized, integrated, multi-sensory teaching method. At the conclusion of the case conference, the Neins were not satisfied with the proposed IEP. They therefore decided to go forward with the due process hearing scheduled for the following month.

## V. *The Initial Hearing Officer's Decision*

The due process hearing in this matter was held on November 23–25, 1998, and the initial hearing officer issued his decision on January 11, 1999. Prior to the hearing, the parties had identified four specific issues for trial. The following are the initial hearing officer's conclusions of law regarding each issue:

1. *Has the LEA [local education agency] failed to provide the student with a free appropriate public education in the least restrictive environment wherein he failed to receive educational benefit?*

 Yes. Although the Student did receive educational gains in some areas, and made reported progress of six months per year in the Milestones reading program, the progress was not transferable to other academic or non-academic areas wherein student could read, and the student for all intents and purposes was a non reader during the his [sic] first four grades within the LEA educational environment.

 The ability to read is a fundamental ingredient in a free appropriate education that can be diminished only by a finding that the disabled child is clearly incapable of achieving reading skills transferable to life settings. The failure to use an approach that will provide Student with the tools to become an independent reader is alone an important reason why the LEA did not provide an appropriate education.

2. *If yes, does the denial of a free appropriate public education to the Student require extended school year services or compensatory educational services?*

 YES, compensatory education is appropriate for the student. The parent's [sic] concept of extended school year is misplaced, however, compensa-

tory education is appropriate where student has been denied a FAPE.

3. *Are the parents entitled to reimbursement for the expenses incurred for the 1998 summer program and/or the current placement at the de Paul school?*

YES.

4. *What is the proper placement and related services and accommodations required to provide the student with a free appropriate public education in the least restrictive environment for the 1998–1999 school year?*

THE de Paul SCHOOL. As the LEA has failed to provide a FAPE, the IHO finds and concludes that the unilateral placement and services provided by the de Paul School to teach a learning disabled child with the specific learning disability of dyslexia is appropriate.

R. 226–27. In light of these findings, the initial hearing officer ordered Greater Clark to reimburse the Neins for the cost of expenses incurred for Lucas's placement at The de Paul School summer program and for the 1998–99 school year, and to pay for two years of compensatory education at The de Paul School. R. 228. The initial hearing officer also ordered Greater Clark to reimburse the Neins for the reasonable cost of transporting Lucas to The de Paul School.

## VI. *The Board of Appeals' Decision*

Greater Clark appealed the initial hearing officer's decision to the state's Board of Appeals. In its Petition for Review, Greater Clark made numerous objections to the initial hearing officer's findings of fact and conclusions of law. In summary, Greater Clark objected to the initial hearing officer's conclusion that it did not provide Lucas with a free appropriate public education and asserted that it was not required to provide Lucas with a free appropriate public education designed to maximize his potential. R. 11. Greater

Clark also maintained that the initial hearing officer incorrectly evaluated Lucas's educational progress. R. 12. Finally, Greater Clark argued that, because it had provided Lucas with an appropriate public education, it should not be required to reimburse the Neins for any educational expenses. R. 13.

The three member Board of Appeals held a hearing without oral argument on April 27, 1999, and issued an opinion the following day. R. 1–18, 150–207. The Board of Appeals upheld some of the initial hearing officer's findings and conclusions and struck others based on Greater Clark's arguments. In summary, the Board of Appeals concluded, by a 2–1 vote, that Greater Clark had provided a free appropriate public education to Lucas, that Lucas was not entitled to compensatory education, and that the Neins were not entitled to any financial reimbursement from Greater Clark. R. 18. The Neins then petitioned this court for judicial review of the Board of Appeals' decision.

### Discussion

## I. *Free Appropriate Public Education*

The IDEA provides "elaborate and highly specific procedural safeguards," but only "general and somewhat imprecise substantive admonitions." *Board of Education v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Unlike plaintiffs in many IDEA cases, the Neins do not challenge the procedures Greater Clark used to decide upon educational programs for Lucas. They contend instead that Greater Clark failed to meet the substantive standards of the Act, which require a "basic floor of opportunity" for disabled children in the form of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. 3034.

The central substantive issue here is whether Greater Clark provided Lucas with a free appropriate public education under the IDEA. The Neins contend that

during Lucas's four years at Parkwood Elementary, Greater Clark failed to provide him with the minimum required educational benefit under the IDEA and that, despite this failure, Greater Clark again proposed to use the same teaching methods if Lucas had stayed there for fifth grade.

The Neins rely primarily on Lucas's scores on academic achievement and intelligence tests. When Greater Clark first evaluated Lucas in March and May 1995, when he was in first grade, his full scale score of 95 on the WISC–III test was in the average range and indicated that Lucas had the ability or potential to learn. R. 454. Lucas's reading cluster score of 68 and his written language cluster score of 84 on the Woodcock–Johnson Achievement Test, however, indicated that Lucas fell significantly short of his potential in reading and short of his potential in writing.

The Neins compare those results to the evaluation three years later when Lucas was tested by Karen Dakin at the Cleveland Clinic in August 1998. On the Woodcock–Johnson Achievement Test, Lucas had a written language cluster score of 51 and a basic reading skills cluster score of 66. R. 1448. Lucas had a reading subtest score of 61, a spelling subtest score of 69, and an arithmetic subtest of 85. R. 1449. At the due process hearing, Ms. Dakin explained that these scores are "standard scores" that basically compare a child's scores to those of his age-group peers. R. 579. These standard scores also permit comparison of Lucas's achievement in certain educational areas to his IQ, or his academic potential. R. 578. Ms. Dakin also testified that Lucas's August 1998 writing, reading, and math scores had all dropped when compared with his 1995 scores. R. 579. The Neins contend this evidence demonstrates that Lucas did not make adequate or minimal educational progress from 1995 to 1998 under Greater Clark's programs.

In response, Greater Clark contends that Lucas received at least some educational benefit at Parkwood Elementary and that under the IDEA, he is entitled only to an appropriate education, not the very best possible education. Greater Clark focuses on the fact that Lucas progressed in the Milestones reading program at the rate of about half a year per year of school. It argues that such progress is not trivial or insignificant but is "undisputed evidence of significant educational benefit." Def. Br. at 30. Greater Clark also points to Lucas's grade level promotion each year and his good academic grades. Greater Clark also contends that Lucas's standardized test scores are not an appropriate or accurate measurement of his academic progress because the standardized tests do not reliably measure the progress of children with learning disabilities. Greater Clark relies on the testimony of its school psychologist, Dr. Claypool, who explained how standardized tests are "not particularly sensitive to individual growth," R. 541, and the testimony of the headmaster at The de Paul School, who explained that "students with learning disabilities tend to do less well on achievement testing, especially formal achievement testing than others would." R. 848.

The substantive disagreement between the parties, and between the initial hearing officer and the Board of Appeals, revolves around two related questions: (1) what level of educational benefit is necessary to satisfy the requirements of the IDEA; and (2) what is the proper measure of educational benefit? When the Supreme Court addressed the first question in 1982, it held that an IEP is valid under what is now the IDEA if it is "reasonably calculated to enable the child to receive educational benefits." *Board of Education v. Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. The Court also held that a state satisfied the requirement of providing a free appropriate public education "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203, 102 S.Ct. 3034.

In *Rowley*, the Supreme Court carefully declined to "establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act," *id.* at 202, 102 S.Ct. 3034, but the outer bounds of the law's substantive requirements are deceptively easy to articulate. The Supreme Court explicitly rejected in *Rowley* any suggestion that the IDEA requires public schools to furnish every service "necessary to *maximize* each handicapped child's potential." *Id.* at 199, 102 S.Ct. 3034 (emphasis added). However, federal courts have also recognized that a school does not satisfy the IDEA by offering "mere token gestures," *Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1048 (5th Cir.1989), or a "trifle," *J.S.K. v. Hendry County School Board*, 941 F.2d 1563, 1573 (11th Cir.1991).[3]

Similarly, in *Ridgewood Board of Education v. N.E.*, the Third Circuit reversed a district court decision in favor of a school based on the theory that the IEP for a dyslexic student had been sufficient because it provided "more than a trivial educational benefit." 172 F.3d 238, 247 (3d Cir.1999). The Third Circuit explained that the IDEA "calls for more than a trivial educational benefit," so that an IEP must be reasonably calculated to confer "meaningful benefit." *Id.*, quoting *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182, 184 (3d Cir.1988).

■ A recent amendment to the IDEA also offers some insight regarding what level of educational benefit is necessary to satisfy the requirements of the IDEA. Congress amended the *Purposes* section of the IDEA in 1997 to state that the IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (1998). The stated purpose of preparing a child for employment and independent living supports the Third Circuit's view in *Ridgewood* that an IEP must be reasonably calculated to provide a child with a *meaningful* educational benefit. Additionally, Congress' statement that an IEP should be designed to meet a child's "unique" needs reinforces the Supreme Court's holding in *Rowley* that special edu-

---

**3.** During the Board of Appeals review hearing, the panel members voted to strike the initial hearing officer's conclusion of law number six because it referred to the Eleventh Circuit's opinion in *J.S.K.*, which stated that the IDEA requires a public school to provide educational benefit greater than a "trifle," and that an "appropriate education" is defined in terms of "making adequate gain" in the classroom. See R. 179–180, 224–25, referring to 941 F.2d at 1573 ("We in fact do define 'appropriate education' as making measurable and adequate gains in the classroom."). The Board of Appeals panel members determined that the Eleventh Circuit's use of the term "adequate" in *J.S.K.* was not "applicable" to an Indiana IDEA case. R. 179–80. Although some states have adopted standards more exacting than those under the IDEA, the Eleventh Circuit's opinion in *J.S.K.* clearly indicates that the court was applying *federal* standards. Only the Supreme Court of the United States could overturn the Eleventh Circuit's view of this federal law. Although the Eleventh Circuit's statement of the law is not binding precedent on the Board of Appeals or this court, the Seventh Circuit has often instructed that district courts should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever they can." *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987); accord, *e.g.*, *Richards v. Local 134, IBEW*, 790 F.2d 633, 636 (7th Cir.1986).

The Eleventh Circuit's opinion in *J.S.K.* represents a federal appellate court's reasoned interpretation and application of the same federal law that the hearing officer here (and now this court) have also been asked to interpret. No court treats the IDEA as requiring schools to *guarantee* that a child will make gains in the classroom, adequate or otherwise, but this court agrees with the Eleventh Circuit that the adequacy of an educational program for a child with disabilities must be gauged on a case-by-case basis in light of the child's individual needs, potential, and efforts. The Board of Appeals' apparent out-of-hand rejection of *J.S.K.* is not consistent with the processes by which federal law is interpreted and applied, or with the Board's responsibilities under the IDEA.

cation services must be "personalized." See 458 U.S. at 203, 102 S.Ct. 3034.

If an IEP must be designed to take into account a child's individual educational needs, it logically follows that the child's capacity to learn should also be considered in evaluating the IEP. Thus, when gauging substantive compliance with the IDEA, the educational benefit provided to the child "must be gauged in relation to the child's potential," so that when a student displays "considerable intellectual potential," the IDEA requires "a great deal more than a negligible [benefit]." *Ridgewood Board of Education,* 172 F.3d at 247, quoting *Polk,* 853 F.2d at 185, 182. Similarly, evidence that a child has made some "minimal improvement" does not necessarily show the school has satisfied the *Rowley* standard. *Hall v. Vance County Board of Education,* 774 F.2d 629, 636 (4th Cir.1985).

The Fourth Circuit's decision in *Hall* offers a useful road map for this case because it also dealt with a dyslexic student for whom, like Lucas Nein, there was a wide gap between overall ability and intelligence and his ability to decipher written symbols. The court stated plainly that it was not adopting a requirement of maximizing potential, and instead considered the evidence of the child's educational progress in light of evidence of his capabilities:

> *Rowley* recognized that no single substantive standard can describe how much educational benefit is sufficient to satisfy the Act. Instead, the Supreme Court left that matter to the courts for case-by-case determination. In approaching this question, the district court adopted the *Rowley* court's strategy. It considered James' capabilities and intellectual progress and what the school had provided him. *Cf. Rowley,* 458 U.S. at 202–03, 102 S.Ct. 3034.

Defendants contend, however, that James' academic progress, as measured by his grade promotions and test scores, evinces educational benefit and requires under *Rowley* that the district court's ruling be overturned. We disagree. Although the *Rowley* Court considered Amy Rowley's promotions in determining that she had been afforded a FAPE, the Court limited its analysis to that one case and recognized that promotions were a fallible measure of educational benefit. *Id.* at 202, 203 n. 25, 102 S.Ct. 3034. The district court did not err in discounting James' promotions in light of the school's policy of social promotion and James' test scores and independent evaluations. Nor was the district court compelled by a showing of minimal improvement on some test results to rule that the school had given James a FAPE. *Rowley* recognized that a FAPE must be tailored to the individual child's capabilities and that while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children. Clearly, Congress did not intend that a school system could discharge its duty under the EAHCA [predecessor to the IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial. We do not believe that the district court committed error in determining from the tests taken as a whole and the independent evaluations pronouncing James "functionally illiterate" and "untestable" that the Vance County schools had failed to provide James with a FAPE before January 1982.

774 F.2d at 635–36; accord, *Ridgewood Board of Education,* 172 F.3d at 247–48 (noting that *Rowley* rejects "a bright-line rule on the amount of benefit required of an appropriate IEP in favor of an approach requiring a student-by-student analysis that carefully considers the student's individual abilities;" reversal required because district court "may not have given adequate consideration to [the child's] intellectual potential" in reaching its decision).

Following the approach of the Fourth Circuit in *Hall* and the Third Circuit in *Ridgewood,* the issue here is whether, in light of Lucas' abilities and disabilities, Greater Clark offered him an IEP reasonably calculated to provide meaningful educational benefit. The court is painfully aware that "meaningful educational benefit" is not an exact standard. See *Rowley,* 458 U.S. at 201–02, 102 S.Ct. 3034 (declining to adopt a single standard for all children, all disabilities, and all cases). In applying that broad standard of meaningful educational benefit, the court must give due deference to the Board of Appeals' conclusions, and the court must be careful to avoid merely taking sides in a reasonable debate over educational policy, theory, or method. The court must also take care to remember that IEPs are not guaranteed to succeed. A child's failure to succeed or progress does not necessarily prove the school has failed to provide an appropriate public education, for there may be other explanations for the lack of meaningful success or progress. Also, of course, some children will always be below the mean, and if some children's test scores are improving relative to others' in the same age group, then some children's scores will reflect drops in percentiles. Nevertheless, merely trivial or minimal progress is not sufficient, at least when there is reason to expect that a child should be able to make meaningful educational progress with appropriate and necessary services.

In its brief, Greater Clark has struck all of these cautionary chords. Courts must defer to the expertise of school officials and should not try to resolve disputed issues of educational policy or practice. The public schools have limited resources. And a child's disabilities may be so severe as to make it impossible for the child to meet his parents' (and perhaps a court's) hopes and expectations. See Def. Br. at 26–31. Taking all of those cautions into account, however, on facts as extreme as these, where a child with a severe learning disability but significant potential made no transferable progress in three years, and where there was no indication the public school was ready and able to change direction, the limits of "due weight" and judicial deference to school authorities have been exceeded.

After reviewing the evidence and the administrative findings, it is clear that by the time Lucas was in fourth grade, and perhaps well before then, Greater Clark's IEP for him was no longer reasonably calculated to confer educational benefit upon him. Seven findings by the initial hearing officer have particular significance here. Greater Clark objected to each of the initial hearing officer's findings set forth below. After considering the objections, however, the Board of Appeals adopted five of those findings as written by the initial hearing officer, and it adopted the other two with minor changes. See R. 150–207. In addition, these findings are supported by substantial evidence in the record, and there is no meaningful basis for Greater Clark to dispute them, as adopted or modified by the Board of Appeals: ·

6. The school psychologist stated the WISC–III [conducted when Lucas was in first grade] revealed there were no significant discrepancies between verbal and performance score [sic] which resulted in average intelligence. The scores indicated the Student had the ability to process, to learn. [Adopted by Board of Appeals without change.]

15. Dr. Eglen stated that student does not have the ability to work at developmental grade level for his age and probably will not get any better.

He further opined that he wondered if the student lacks essential basic or fundamental tools of being able to learn. "He may not be teachable."

He further stated that progress in reading and language arts at the rate of six months per year "might be the very best of which he's capable of doing," but that was a "hypothetical", a "conjec-

ture", "I don't know yet." ["]I don't think the evidence is here." [Adopted by Board of Appeals without change.]

20. *There was no evidence of probative value in the record that the Student's progress in the Milestones reading program transferred to other academic or nonacademic areas which required reading to any degree whether it was reading from books, signs, etc.* [Adopted by Board of Appeals without change.]

21. LEA personnel appeared to have a reluctance in considering dyslexia in any way other than a learning disability. In addition, the LEA personnel did not demonstrate any expertise or extended training in teaching students defined as dyslexic. [Modified by the Board of Appeals to read:

21. LEA personnel appeared to consider dyslexia within the context of a learning disability. In addition, the LEA personnel did not demonstrate any expertise or extended training in teaching students defined as dyslexic.]

22. Student has received considerable special education services that that [sic] been effective in certain areas, but not very effective in reading, and not demonstrably transferable. [Adopted by Board of Appeals without change.]

23. Karen Dakin further testified as follows:

(Student), we're discussing him now because his reading is still pretty much on a first-grade level. Obviously there's been some growth. He's learned some sight words, he's not a preprimer level, he's ... at middle of first grade and a first grade level. But he's been in the program three years and that's *extremely limited growth for a child with average ability.*

We have to understand that even with a learning disability and interfacing factors like language and attention difficulties, much more growth can be obtained and should be obtained or goals should be changed or programs should be changed. We've got to respond when growth has not been good and be creative and try to explore and find another more productive program. He's obviously made some growth; it's just extremely limited, and he's entitled to more growth than that.

A structured language program with reading remediation may take up to three years to get the Student to an independent reading situation.

The IHO adopts the above summary as findings of fact. [Adopted by Board of Appeals without change.]

29. The uncontroverted testimony of the experts on dyslexia clearly establishes that to benefit educationally Student requires an intensive program of individualized, integrated, multi-sensory sequential training. See *Evans v. Board of Education,* 930 F.Supp. 83 (S.D.N.Y.1996).[Modified by the Board to read:

29. Testimony of the experts on dyslexia clearly establishes that to benefit educationally Student requires an intensive program of individualized, integrated, multi-sensory sequential training.]

See R. 213–23 (internal citations omitted and emphasis added).

Thus, the initial hearing officer and the Board of Appeals agreed on the following facts: that despite Dr. Eglen's "conjecture" to the contrary, Lucas had average intelligence and the ability to process and learn; that the special education services Lucas received at Parkwood Elementary had been effective in some areas but had not been very effective in reading; that Lucas could not read anything outside of the Milestones reading program; that at the end of fourth grade, Lucas's reading skills were at the middle of first grade level; that an expert in dyslexia believed Lucas had "extremely limited growth" while at Parkwood Elementary and was "entitled to more growth than that;" and finally, that Greater Clark personnel did not demonstrate any expertise or extended

training in teaching students defined as dyslexic.

Upon review of these facts, it is clear that Greater Clark failed to provide Lucas with a free appropriate public education. Whether Lucas's educational progress (or lack thereof) at Parkwood Elementary is measured by his scores on academic achievement tests, or by his progress in the Milestones reading program and his promotion each year to the next grade level, the result is the same: after three years of special education services, Lucas could not read anything outside the Milestones reading program. Like the child in *Hall v. Vance County Board of Education,* who as an eleven-year-old fifth grader could not distinguish between the words "ladies" and "gentlemen" on public restroom doors, 774 F.2d at 630, Lucas also could not read restroom signs as a ten-year-old fourth grader. See R. 880–81. He was still functionally illiterate.

Greater Clark relies, however, on Lucas's progress within the Milestones program at the rate of about half a year per year of school to show the IEP offered Lucas "some" educational benefit. Greater Clark describes this progress as "far from a trivial or insignificant benefit." Def. Br. at 30. Greater Clark also invokes the Sixth Circuit's automotive metaphor, saying that it offered the Neins "the educational equivalent of a serviceable Chevrolet," while they demand "a Cadillac solely for [their] use" at taxpayer expense. See Def. Br. at 24–25, quoting *Doe v. Board of Education of Tullahoma City Schools,* 9 F.3d 455, 459 (6th Cir.1993).

This argument ignores the limits of the evidence, which convinced both the initial hearing officer and the Board of Appeals that even Lucas's slow progress in the Milestones program had not produced transferable progress to other areas. See Finding 20. The Milestones program is and was not an end in itself: the goal is to help a child with dyslexia become a functioning adult. Because Lucas could not read anything outside the Milestones read-

ing program, his progress in the Milestones program itself is of marginal relevance. *Rowley* explains the requirements of the IDEA in terms of providing "access" to an education. At the risk of carrying these metaphors too far, for a student like Lucas, the ability to read is truly the key that opens the door to all other aspects of an education. In terms of the automotive metaphor, Greater Clark was providing the Neins a Chevrolet without a transmission—even if the engine might run, no power ever reached the wheels. Because the Milestones program produced no *transferable* progress in three years, as both the initial hearing officer and the Board of Appeals found, the program was plainly failing to provide even a minimally *adequate* educational benefit.

Greater Clark also relies on *Rowley* to argue that Lucas's good grades and promotions from grade to grade show he was making some educational progress. Def. Br. at 29. In *Rowley,* the Supreme Court indeed considered the child's grades and promotions as evidence that she was receiving substantial educational benefits. 458 U.S. at 202–03, 102 S.Ct. 3034. However, the child in *Rowley* was deaf and was able to earn better than average grades in a regular classroom. *Id.* The Court expressly disclaimed the use Greater Clark tries to make of the point: "We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'" 458 U.S. at 203 n. 25, 102 S.Ct. 3034.

In this case, Lucas was graded on a modified scale and his tests and quizzes were modified, often being read to him aloud because he was unable to read them. As for his promotion each year to the next grade level, Greater Clark had a policy of not retaining students at a particular grade level. See R. 419. The policy was based on the desire to minimize the negative effect such retention might have on a child's social skills and self-esteem. R.

220. Thus, in this case, Lucas's promotions to the next grade level are not evidence of educational benefit from the Greater Clark program. See *Hall*, 774 F.2d at 636 ("The district court did not err in discounting [the student's] promotions in light of the school's policy of social promotion and [his] test scores and independent evaluations.").

Greater Clark also argues that, regardless of the lack of benefit Lucas received from special education services offered to him during his first through fourth grade years, the IEP directly at issue in this matter, the one designed for his fifth grade year at Parkwood Elementary, was reasonably designed for educational gain. Greater Clark does not appear to dispute that this IEP, as originally designed in April 1998, essentially proposed to continue the same special education services Lucas had been receiving for the prior three years. It provided for Ms. Hoeppner to continue working with him, and she again would have been responsible for choosing the methods and curriculum to use in teaching Lucas. It also provided for Lucas to continue in the Milestones reading program, and it contained the same goals of increasing his reading, written language, and math skills by six months. R. 1396. Because the April 1998 IEP proposed to provide essentially the same services that had failed Lucas during the prior three years, it is clear that the April 1998 IEP was not reasonably designed to provide Lucas with an educational benefit.

Greater Clark argues, however, that revisions made to Lucas's fifth grade IEP at the October 1998 case conference showed the proposed IEP was reasonably designed to provide him with an educational benefit. Greater Clark maintains that the revised IEP implemented all of Ms. Dakin's recommendations. See Def. Br. at 38. Ms. Dakin had determined that the "whole language or literature based" teaching method used by Ms. Hoeppner had "not been effective with Lucas" and was unlikely to be effective in the future.

R. 1450. She therefore recommended the use of a reading program involving direct teaching and multisensory, structured, sequential techniques. *Id.* She also recommended that Lucas receive special accommodations in the school setting, such as preferential seating, close monitoring of his behavior, and the breaking down of larger projects into smaller components. R. 1451. Finally, she also testified that her recommendations could be implemented in a public school setting. R. 633.

The court assumes it is possible to implement those recommendations in a public school setting. The problem here is that there is no evidence that Greater Clark was planning to do so or was even capable of doing so. Greater Clark contends that Ms. Hoeppner's testimony before the initial hearing officer "confirms that not only was it possible to implement Ms. Dakin's recommendations in the public school context, but that she had actually done so." Def. Br. at 38. The court disagrees.

The initial hearing officer questioned Ms. Hoeppner regarding a public school's ability to implement a teaching program similar to that used by The de Paul School. Ms. Hoeppner testified that it would be possible for a public school to implement such a program. See R. 814–16. The initial hearing officer then asked Ms. Hoeppner to compare the IEP developed for Lucas's fifth grade year to the type of teaching program used by The de Paul School. In comparing Greater Clark's plan to develop Lucas's reading skills with the program used at The de Paul School, Ms. Hoeppner testified: "As far as the reading, you know, we had goals developed for reading and written expression. As far as the four periods a day [of reading instruction at The de Paul School], the only thing that would need to be changed on what we had written up would be the time frame." R. 816.

The cited testimony also contains a series of questions by the initial hearing officer regarding Greater Clark's willingness to implement different teaching methodol-

ogies. Ms. Hoeppner testified that Greater Clark would be willing to "try something new" anytime "something's not working." R. 820. The initial hearing officer then asked: "Well, for instance, if they [a private teaching program] would at least demonstrate that they had a teaching methodology for dyslexia students that accomplished more results, you would not be adverse to adopting that into your system?" *Id.* Mrs. Hoeppner responded: "Oh, absolutely not." *Id.*

Although this testimony demonstrates Ms. Hoeppner's belief that Greater Clark could implement recommended teaching methodologies and would be willing to do so, it does not show that Ms. Hoeppner either had actually implemented Ms. Dakin's recommendations or was planning to do so. Ms. Dakin made numerous recommendations, but the recommendation most at issue here was that Greater Clark implement a direct teaching reading program using multisensory, structured, sequential techniques. Ms. Hoeppner did not testify that Lucas's fifth grade IEP included the use of such a teaching program, or that she was planning to use such a teaching program. In fact, Lucas's IEP does not provide for the use of a direct teaching method or any other particular teaching technique to be used to improve his reading skills. See R. 1464–1500. As Ms. Hoeppner explained, because there are never any specific instructions in a student's IEP regarding teaching methodology or technique, Ms. Hoeppner would determine what teaching techniques to use with a particular student by looking at the broad goals contained in the student's IEP. See R. 350. There is simply no evidence in the record indicating that, if Ms. Hoeppner had had the opportunity to implement the fifth grade IEP, she was planning to use a teaching method or technique different from those she had used unsuccessfully with Lucas for the prior three years.

Even if Lucas's revised fifth grade IEP had provided for direct teaching using multisensory, structured, sequential techniques to improve his reading skills, there also is no evidence that any Greater Clark personnel were sufficiently qualified to work with dyslexic children. Both the initial hearing officer and the Board of Appeals found as a fact that Greater Clark personnel did not demonstrate any expertise or extended training in teaching students defined as dyslexic. The record supports this finding. See R. 722–25; 737–39.

In light of this evidence, the Board of Appeals could not reasonably: (a) credit Ms. Dakin's testimony that Lucas had "extremely limited growth" while at Parkwood Elementary, (b) find that Lucas was unable to transfer his Milestones reading skills to any other written material, (c) find that Greater Clark personnel did not demonstrate any expertise or extended training in teaching students defined as dyslexic, yet then conclude (d) that Greater Clark was the appropriate educational placement for Lucas because "the IEP formulated by the School was reasonably designed for educational gain and is consistent with the requirements of IDEA, and therefore constitutes a FAPE." See R. 17–18.

The evidence demonstrates that Lucas Nein has the ability to learn how to read and that, for three years, Greater Clark was unable to help Lucas transform his *potential* to learn how to read into an *actual* ability to read. When confronted with evidence of this failure, Greater Clark then failed to offer anything but more of the same for Lucas in his fifth grade year. These facts alone establish that Greater Clark did not provide Lucas or offer him an appropriate public education.

The court recognizes that educational policy decisions are generally best left to school authorities. However, the court also has a duty under the IDEA to review the evidence in the record carefully and to determine whether, in light of the evidence, school authorities have made a reasonable decision. Even giving due deference to the findings of the Board of

Appeals majority, the Neins have shown by a clear preponderance of the evidence that Greater Clark's IEPs for Lucas were not reasonably calculated to provide educational benefit sufficient under the IDEA. The conclusion by the Board of Appeals majority that Greater Clark had provided Lucas with a free appropriate public education was not reasonable. The IDEA allows schools considerable leeway in choosing educational programs and methods, but it requires more than Lucas received in this case.

## II. *Reimbursement*

In some cases, families and school authorities will agree in a child's IEP that the appropriate program for the child is a private school placement at public expense. Also, under certain circumstances, the IDEA permits parents of children with disabilities who unilaterally place their children in private schools to seek education expense reimbursement from the public school agency. In part, the IDEA provides:

> (ii) Reimbursement for private school placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii).

Relying on this statutory provision, the Neins contend the Board of Appeals erred in finding that Greater Clark was not required to reimburse them for the expenses they incurred by enrolling Lucas at The de Paul School for the summer of 1998 and the 1998–99 school year, and for the cost of two years of compensatory education at The de Paul School. The Neins maintain that, because Greater Clark failed to make a free appropriate public education available to Lucas, they are entitled to such reimbursement. Greater Clark contends that even if it failed to provide a free appropriate public education, reimbursement should be denied for two reasons: (1) The de Paul School is not a proper educational placement for Lucas under the IDEA because it does not provide the "least restrictive environment," and (2) the Neins failed to give advance notice that they intended to have Greater Clark pay for the private school expenses, for such advance notice is relevant under 1997 amendments to the IDEA. See 20 U.S.C. § 1412(a)(10)(C)(iii) (discussed below).

### A. *Proper Educational Placement*

■ Before reimbursement can be ordered, the Neins must show that "the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County School District Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); accord, *Monticello School District v. George L.*, 102 F.3d 895, 905–06 (7th Cir.1996). The Neins have demonstrated that placement at Greater Clark violated the IDEA because Lucas's IEPs were not reasonably calculated to provide educational benefit. The next issue is whether The de Paul School is a proper placement. "A private placement may be proper if it is appropriate and provided in the least restrictive educational environment." *Ridgewood*, 172 F.3d at 248.

■ The initial hearing officer found The de Paul School was the proper educational placement for Lucas, see R. 227, but the Board of Appeals reversed the initial hearing officer's finding and held that Greater Clark was the appropriate public placement for Lucas. R. 51. Because the Board of Appeals concluded that Greater Clark was the appropriate placement, it did not address whether The de

Paul School would have been a proper private placement.

Greater Clark argues that the Neins have failed to show that The de Paul School is an appropriate educational placement for Lucas because the school is not the least restrictive environment (LRE). See 20 U.S.C. § 1412(a)(5)(A), which requires states, as a condition of receiving federal funds under the IDEA, to ensure that students with disabilities are educated with nondisabled students to the " maximum extent appropriate." As the Seventh Circuit has explained:

> the IDEA and the case law interpreting the IDEA give strong preference to mainstreaming students with disabilities. This directive is also referred to as the LRE requirement. The IDEA requires that, in determining a FAPE for any student, that student's education must take place in the LRE for the student.

*Monticello School District*, 102 F.3d at 906.

Greater Clark relies on the Eighth Circuit's decision in *Independent School District No. 283 v. S.D.*, 88 F.3d 556 (8th Cir.1996), to support its argument. In *Independent School District*, parents of a student with severe dyslexia unilaterally enrolled him at a private school that focused exclusively on dyslexic children. Although the initial hearing officer denied the parents' request for reimbursement, a review officer reversed and granted reimbursement. On judicial review, the district court ruled for the school district, finding that, because the school district had provided the student with a free appropriate public education, the parents were not entitled to reimbursement for education expenses at the private school. In affirming the district court's decision, the Eighth Circuit noted that the review officer had failed to cite "substantive differences" between the private school's and the school district's education programs. *Id.* at 561. Additionally, the review officer had failed "to explain in educational terms why IDEA's preference for 'mainstreamed'

public education should be ignored in this case." *Id.*

There is a decisive difference between the facts presented here and those presented in *Independent School District*: there are important "substantive differences" between Greater Clark's education program and that of The de Paul School. As explained above, Lucas's IEPs at Greater Clark did not provide for a direct teaching reading program using multisensory, structured, sequential techniques, and even if they had, Greater Clark personnel were not qualified to work with dyslexic children. The de Paul School, however, did use such a teaching method with Lucas and had a history of working with dyslexic children.

Mainstreaming is not required in every case. See *Murphysboro*, 41 F.3d at 1168. Because " 'mainstreaming to the maximum extent appropriate' does not mean the maximum extent feasible," *D.F. v. Western School Corp.*, 921 F.Supp. at 566, quoting *Murphysboro*, 41 F.3d at 1168, it must be determined whether the child is benefiting educationally from mainstreaming. The evidence in the record here demonstrates that, for three years, Lucas did not benefit educationally from Greater Clark's educational plans. The evidence also demonstrates that Lucas would not have benefited from Greater Clark's revised October 1998 IEP. Thus, there is a good reason in this case to discount Greater Clark's reliance on the IDEA's "strong preference" for mainstreaming.

Additionally, because Greater Clark has not offered any alternatives to its revised October 1998 IEP, The de Paul School is the only alternative educational placement proposed here. The court must therefore determine if it is an appropriate placement, regardless of the fact that Lucas would not be mainstreamed with non-disabled children if he were placed at The de Paul School. See *Murphysboro*, 41 F.3d at 1168 ("Since the court was presented with only one option, it was not required to

locate another school that would satisfy the least restrictive alternative requirement based on the entire pool of schools available, but rather was required simply to determine whether that one available choice would provide an appropriate education for [the student]."); accord, *Warren G. v. Cumberland County School District,* 190 F.3d 80, 83–84 (3d Cir.1999) (affirming student's placement in private school and rejecting public school district's argument that placement was improper because it was not the least restrictive environment; "the test for the parents' private placement is that it is appropriate, and not that it is perfect"); *Board of Education of Montgomery County v. Hunter,* 84 F.Supp.2d 702, 706 (D.Md.2000) (rejecting school district's argument that private educational placement was improper because it was not the least restrictive environment; because public school district had failed to provide student with a free appropriate education, the district's argument was "inconsequential").

One finding by the initial hearing officer is particularly relevant to whether The de Paul School is a proper educational placement:

> 28. The Record, including the transcript of testimony, reports the history of The de Paul School and its emphasis upon teaching students of average ability with the learning disability known as dyslexia. Although the Student has attended the setting for a short period of time, there is sufficient evidence of probative value to find and conclude that the program is appropriate and the Stu-

dent is beginning to make gains. Additionally, the LEA did not criticize or dispute the efficacy of the program other than to suggest that recommendations of the Cleveland Clinic and the program of The de Paul School "could" be implemented within the LEA setting. The IHO is mindful that the IHO (and Court) is not to decide which program offers the greatest benefits, but whether the program offered enables the child to receive an educational benefit. The fact that Student made progress at The de Paul School is merely an indication that that type of program is appropriate and effective.

On review, the Board of Appeals made some modifications and substantially adopted the first paragraph of this finding:

> 28. The Record, including the transcript of testimony, reports the history of The de Paul School and its emphasis upon teaching students of average ability with the learning disability known as dyslexia. Although the Student has attended the setting for a short period of time, *there was some testimony to suggest he is beginning to make gains.* Additionally, the LEA did not criticize or dispute the efficacy of the program other than to suggest that recommendations of the Cleveland Clinic and the program of The de Paul School "could" be implemented within the LEA setting.

R.221 (emphasis added). Thus, both the initial hearing officer and the Board of Appeals agreed there was some evidence that Lucas had made progress at The de Paul School.[4]

---

4. During the Board of Appeals review hearing, one panel member expressed concern that there was no evidence that Lucas made any statistically significant progress at The de Paul School. See R. 165–67. Lucas was tested in five areas at the beginning of The de Paul School summer program, and was again tested in the same areas at the end of the six week program. The following is a summary of his scores (which reflect grade-equivalent performance):

| | Pre-test | Post-test |
|---|---|---|
| Reading Comprehension | 2.0 | 2.4 |
| Vocabulary | 2.3 | 2.1 |
| Concepts of Number | 2.8 | 3.1 |
| Math Computation | 2.5 | 2.8 |
| Math Application | 2.3 | 3.2 |

R. 1440. Although these scores indicate that Lucas improved in four out of five areas, the court has not found any evidence in the record regarding the margin of error on these scores. In addition, the Board of Appeals mistakenly thought the summer program had lasted three months, when it actually lasted for just six weeks, which probably affected the expected degree of improvement. Compare

The de Paul School used a multisensory direct teaching program with Lucas, and Ms. Dakin testified that, in her opinion, The de Paul School seemed "like a very appropriate school for Lucas at this time." R. 595. Considering this evidence, as well as evidence regarding the history of The de Paul School and its emphasis upon teaching dyslexic students, the court finds that the initial hearing officer properly decided that The de Paul School would provide an appropriate education for Lucas.

### B. *Notice*

 Finally, Greater Clark argues that, regardless of whether it provided Lucas с with a free appropriate public education, and regardless of whether Greater Clark is the appropriate placement for Lucas, the Board of Appeals correctly determined that the Neins should not be reimbursed because they failed to comply with the notice requirements for reimbursement. Greater Clark relies on a provision added as part of the 1997 amendments to the IDEA specifically addressing the notice a parent is required to provide to a public school agency when the parent decides unilaterally to place her child in a private school and to seek reimbursement from the public school agency. The new provision states in relevant part:

(iii) Limitation on Reimbursement. The cost of reimbursement described in clause (ii) may be reduced or denied—

(I) if—

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their

intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a business day) prior to removal of the child from the public school, the parents did not give written notice to the public agency of the information described in division (aa).

20 U.S.C. § 1412(a)(10)(C)(iii).

The record shows that the Neins failed to provide written notice to Greater Clark of their intention to enroll Lucas at The de Paul School. The Neins argue, however, that Greater Clark was aware they were planning to place Lucas in a private school. Mr. Nein testified that he had indicated at the April 1998 case conference that he intended to place Lucas at The de Paul School in its summer program during the summer of 1998. R. 887–88. He also testified he informed Greater Clark that after he saw how Lucas progressed in The de Paul School summer program, he and his wife would determine where to enroll Lucas for the 1998–99 school year. *Id.*

The initial hearing officer made the following finding regarding the notice the Neins provided to Greater Clark:

25. Parents did not advise LEA [Greater Clark] in writing of their intention to reject the LEA proposed IEP and their intent to enroll Student in the summer program and school year 1998–99 program at The de Paul School. However, there was considerable testimony presented during the hearing that the LEA had knowledge of consideration or the intent of the Parents to enroll Student at the de Paul School.

R. 222 (internal citations omitted). Upon review, the Board of Appeals adopted this finding, with one slight modification. The Board of Appeals did not agree there was "considerable testimony" presented at the hearing that Greater Clark had knowledge

---

R. 1440 with R. 165. In any event, the court is satisfied (as were the initial hearing officer and the Board of Appeals) that Lucas's scores

indicate he was making educational gains in The de Paul program.

of the Neins' intent to enroll Lucas at The de Paul School. R. at 162–63. The Board therefore deleted the word "considerable" from the second sentence of the initial hearing officer's finding and otherwise accepted the finding as written. R. 163–64.

What is missing, however, is evidence that the Neins informed Greater Clark that they intended to enroll Lucas at The de Paul School *at public expense*. Notice of intent to seek public reimbursement is a critical issue under 20 U.S.C. § 1412(a)(10)(C)(iii). Mr. Nein testified he could not remember whether, at the April 1998 case conference, he asked the school corporation to pay for the summer school program at The de Paul School, see R. 887–88, and there is no evidence the Neins gave notice of their intent to seek reimbursement for the full academic year.

The Seventh Circuit has recognized that "reimbursement to parents for the cost of private school is an equitable remedy which may be imposed in the discretion of the district court." *LaGrange School District v. Illinois State Board of Education*, 184 F.3d at 917–18, citing *Saint Tammany Parish School Board v. Louisiana*, 142 F.3d 776, 783 (5th Cir.1998). Similarly, the initial hearing officer here recognized that the new notice provision requiring a parent to specifically reject a proposed IEP and to notify the school that the parent intended to place the child in a private school *at public expense* is not a mandatory provision. R. 226. A court or hearing officer may therefore consider reducing or denying reimbursement if the parents fail to comply with the provision, but such action by the hearing officer or court is not required. As the initial hearing officer explained: "The provision requiring rejection and notice is not mandatory. The court or hearing officer *may* consider reducing or denying the reim-

bursement but failure to reject the LEA placement or give written notice is not fatal." *Id.* The initial hearing officer therefore exercised his discretion under the IDEA and ordered Greater Clark to reimburse the Neins.[5]

The Board of Appeals reversed and held that the Neins were not entitled to reimbursement. R. 18. The Board based this decision in part on its finding that there was "evidence the parents were given ample notification and were aware of the requirement for written notice of unilateral placement. Their failure to do this argues for denial of reimbursement." R. 17.

The Board's findings that the Neins were aware of the requirements of the notice provision and that they failed to fulfill these requirements were clearly correct. Their failure, as the Board put it, "argues for denial of reimbursement." The court also agrees with the Board's finding that there was evidence in the record that Greater Clark was aware that the Neins intended to enroll Lucas at The de Paul School. However, there is no evidence that the Neins informed Greater Clark in advance that they intended to enroll Lucas at The de Paul School *at public expense.*

Recognizing that the court's ability under 20 U.S.C. § 1412(a)(10)(C)(iii) to award, reduce, or deny reimbursement is an equitable remedy calling for an exercise of judicial discretion, the court finds that, under the facts presented here, a compromise is warranted. In summary, the record demonstrates that neither the Neins nor Greater Clark fulfilled their obligations under the law. Although the Neins plainly failed to give Greater Clark proper notice that they intended to enroll Lucas at The de Paul School at public expense, the court cannot ignore Greater

5. Greater Clark's brief seems to assume that the absence of notice bars the Neins' claim for reimbursement as a matter of law. See Def. Br. at 21–24. The statute plainly states that reimbursement "may" be reduced or denied for failure to give notice, not that it must be denied altogether. See 20 U.S.C. § 1412(a)(10)(C)(iii). The court interprets this language as giving the decision-maker equitable discretion to award, reduce, or deny reimbursement in light of all the circumstances.

Clark's persistent failure, over more than three years, to provide Lucas a meaningful educational benefit. As a result of Greater Clark's failure to give Lucas "access" to an education, Lucas and his family now face the daunting tasks of trying to make up for lost time and working to bridge the large gap between his academic abilities and those of his peers. The court finds that the most equitable remedy here is to order Greater Clark to reimburse the Neins for one half of the reimbursement originally ordered by the initial hearing officer. This resolution takes into consideration the Neins' failure to follow the notice requirements, the evidence that Greater Clark knew the Neins were dissatisfied with its education efforts and intended to enroll Lucas in a private school, and Greater Clark's persistent failure to provide Lucas with an adequate education.

The court will therefore enter judgment ordering Greater Clark to pay the Neins the following: (1) $3500 (one half of the cost of expenses for The de Paul School summer program and the 1998–99 school year); (2) the cost of *one* year of compensatory education at The de Paul School; and (3) one half of the reasonable cost of transportation to The de Paul School, as determined pursuant to 511 I.A.C. § 7–6–6(g), for the 1998 summer program and two school years. The parties' motions for summary judgment are therefore both granted in part and denied in part to the extent set forth in this entry. The court leaves any issue of attorneys' fees to consideration of a timely application pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure.[6]

So ordered.

---

**6.** The United States District Court for the Southern District of Indiana amended its Local Rule 54.1 effective January 1, 2000, to bring it into conformity with Rule 54(d)(2). In the absence of a specific statute or court order to the contrary, the deadline for submitting a motion seeking attorneys' fees is no later than 14 days from the entry of final judgment.